UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

Robert Besedin, Sr.,

                    Plaintiff,

          v.

County of Nassau, Nassau County Police
Department, Police Officer Stephen
Beckwith, and Police Officer John
Mantovani, *in their individual and
official capacities*,

                    Defendants.

18-cv-00819 (NRM) (ST)

**MEMORANDUM AND ORDER**

NINA R. MORRISON, United States District Judge:

Plaintiff Robert Besedin, Sr., brings this action under 42 U.S.C. § 1983 and

state law, stemming from his arrest on February 7, 2017, near and on the steps of

his porch in Baldwin, Nassau County.

Plaintiff commenced the instant action on February 7, 2018, and pled claims

for*, inter alia*, unreasonable and excessive use of force, false arrest, malicious

prosecution, abuse of process, failure to intervene, negligence, intentional infliction

of emotional distress, and municipal liability.  Compl. ¶ 1, ECF No. 1.  He also pled

and voluntarily dismissed the following after a November 4, 2021, pre-motion

conference with the Honorable Kiyo Matsumoto: an equal protection claim; claims

arising under the First, Fifth, and Sixth Amendments (dismissed as to all

Defendants); § 1981 and § 1985 claims (dismissed as to all Defendants); and a claim

1

for intentional infliction of emotional distress (dismissed as to the County of Nassau).  *See* Court's Minute Entry dated November 4, 2021; Pl.'s Letter Dismissing Claims, ECF No. 64.[1]

The case was reassigned to the undersigned on October 18, 2022.  The Court held a pre-motion conference on Defendants' anticipated motion for partial summary judgment on March 19, 2024.  On March 27, 2024, following the pre-motion conference, Plaintiff withdrew his failure to intervene claim and his claim for intentional infliction of emotional distress against all Defendants.  *See* Court's Minute Entry dated March 20, 2024; Joint Letter, ECF No. 103.[2]

Defendants then moved for summary judgment on the remaining claims, with the exception of Plaintiff's § 1983 claim for excessive force and his state law claims for assault and battery.  *See* Defs.' Mem. Supp. Summ. J. 2 ("Defs.' Mem."), ECF No. 107-17.  As to those claims, Defendants deny any unlawful use of physical force against Plaintiff, *id.* at 15–16, but agree that there is a material dispute of fact as to that issue that must be resolved by a jury.  *Id.* at 4.

For the reasons to follow, the Court grants in part and denies in part Defendants' motion for partial summary judgment.

---

[1] All page references use ECF pagination except where noted.

[2] Given Plaintiff's withdrawal of his failure to intervene and intentional infliction of emotional distress claims, the Court will not address them here and instead dismisses those claims.

## FACTUAL BACKGROUND

The Court views the following facts "in the light most favorable to the non-moving party," *Overton v. N.Y. State Div. of Military & Naval Affs.*, 373 F.3d 83, 89 (2d Cir. 2004), and "resolve[s] all ambiguities and draw[s] all permissible factual inferences in favor of the party against whom summary judgment is sought." *Sec. Ins. Co. of Hartford v. Old Dominion Freight Line, Inc.*, 391 F.3d 77, 83 (2d Cir. 2004).

In considering the parties' motions, the Court has carefully reviewed the parties' Rule 56.1 Statements and has independently assessed the underlying record to determine whether genuine issues of material fact exist and summary judgment is appropriate. *See Victory v. Pataki*, 814 F.3d 47, 59 (2d Cir. 2016) ("If, as to the issue on which summary judgment is sought, there is any evidence in the record from which a reasonable inference could be drawn in favor of the nonmoving party, summary judgment is improper." (quoting *Rodriguez v. City of New York*, 72 F.3d 1051, 1061 (2d Cir. 1995))). The Court deems admitted those factual assertions that are not specifically controverted with citations to admissible evidence. *See* Local Civ. R. 56.1(c)–(d); *Vt. Teddy Bear Co., Inc. v. 1-800 Beargram Co.*, 373 F.3d 241, 246 (2d Cir. 2004).

## I.      Plaintiff's 911 Calls and Officers' Visits to Plaintiff's Home

On February 7, 2017, beginning around 1:35 p.m. and ending around 6:46 p.m., Plaintiff Robert Besedin, Jr. made a series of phone calls to 911 operators in Baldwin, Nassau County. *See* Event Chronology Defs.' Ex. G 13:39 ("Dispatch

Recs."), ECF No. 107-08; Tr. of 911 Audio Defs.' Ex. E, ECF No. 107-06; Pl.'s Dep.

Ex. I 55–81, ECF No. 108-10 (Plaintiff testifying that he placed some of the calls but

that he does not remember others).[3]  At the time of these events, Plaintiff was

seventy-one years old and lived alone in a home with a front porch and a camera at

the door pointing towards the front porch's steps.  Pl.'s Dep. at 4, 22–23, 88, 139;

Pl.'s Mem. Opp. Mot. Summ. J. 11 ("Pl.'s Opp."), ECF No. 108; *see also* Pl.'s Med.

Recs. Ex. P 9, ECF No. 110-3.

The 911 calls at issue began with complaints brought by Plaintiff about a

"burglary that happened weeks ago" that he believed had not been properly

investigated.  Dispatch Recs. at 13:39; *see also* Pl.'s Dep. at 49, 63, 80–81;

Mantovani Dep. 45, ECF No. 102-2.  Defendant Police Officer Stephen Beckwith

("Beckwith"), Defendant Police Officer John Mantovani ("Mantovani"), and two

other non-defendant sergeants, Price and Lenarduzzi, were dispatched to a call for a

burglary to Plaintiff's home address and arrived at Plaintiff's home in separate cars.

Mantovani Dep. at 42–43; *see also* Beckwith Dep. 27, 40–41, 54, ECF No. 102-1.

---

[3] To the extent Plaintiff is denying making the 911 calls, the Court notes that
Defendants have submitted the audio calls and may credit those calls to the extent
the calls "so utterly discredit[] the [Plaintiff's] version that no reasonable juror could
fail to believe the version advanced by the moving party." *Zellner v. Summerlin*,
494 F.3d 344, 371 (2d Cir. 2007) ("Incontrovertible evidence relied on by the moving
party, such as a relevant videotape whose accuracy is unchallenged, should be
credited by the court on such a motion if it so utterly discredits the opposing party's
version that no reasonable juror could fail to believe the version advanced by the
moving party." (citing *Scott v. Harris*, 127 S.Ct. 1769, 1775–76 (2007))); *see also*
*Smith v. City of New York*, No. 18-cv-05079-MKV, 2021 WL 4267525, at *3 n.2
(S.D.N.Y. Sept. 20, 2021) ("Plaintiff's claim is at odds with his own video recording
and therefore need not be credited." (citing *Scott*, 127 S.Ct. 1769)).

Sergeants Price and Lenarduzzi had interviewed Plaintiff for about twenty minutes when Beckwith and Mantovani arrived. Mantovani Dep. at 44, 46.[4] No arrest was made, and the officers left the home shortly after. *Id.* at 44–45. According to Mantovani, the officers left because Plaintiff was not cooperating with Sergeant Price who was "trying to get . . . basic information." *Id.* at 45.

Beckwith and Mantovani—and at times, possibly the previously named sergeants—spoke to Plaintiff again at least two more times, but the record is not clear as to how many times or the content of each conversation. At his deposition, Beckwith did not remember all the conversations he and other officers had with Plaintiff. Beckwith Dep. at 41–43. At Mantovani's deposition, Mantovani did not remember the details of each time he and other officers spoke to Plaintiff or even how many times they spoke to him but estimated that he spoke to Plaintiff approximately three times. *See* Mantovani Dep. at 41–46, 59–63. At Plaintiff's deposition, Plaintiff also did not remember what he and the officers talked about. Pl.'s Dep. at 83.[5]

About fifteen minutes after the first call, Beckwith and Mantovani were again dispatched to Plaintiff's home for an "unknown problem" that they immediately cleared upon speaking to him. Beckwith Dep. at 41. The dispatch

---

[4] Beckwith testifies that he may have also spoken to Plaintiff during the first interaction. Beckwith Dep. at 30–33.

[5] Plaintiff also testified at a hearing pursuant to N.Y. Gen. Mun. Law § 50-H, but the parties only provided four pages of that testimony. *See* Pl.'s 50H Tr. Defs.' Ex. L, ECF No. 107-13.

records around this time state that "comp [was] very ag[]itated," Dispatch Recs. at

14:14, and that a "male poss intox [was] continually calling 911 rambling" and that

he "state[d] that [a] PO came there and asked him to step out of the house." *Id.* at

14:19.  Plaintiff continued to call 911 and, according to the dispatch records, was

"cursing and screaming," *id.* at 14:43, with the dispatcher reporting that that he

"sounds intoxicated." *Id.* at 15:13.[6]

Between approximately 2:30 p.m. to 3:10 p.m., the officers were dispatched

again for an "unknown" issue, *id.* at 14:34, and it was again cleared as "unfounded."

*Id.* at 14:45.  Although the record is not clear as to why each call was cleared — and

the dispatch records note that some calls did not lead to officers speaking to

Plaintiff — according to Officer Mantovani, when he and Beckwith spoke to

Plaintiff, Plaintiff refused to tell them why he was calling, he was irate, rambling,

first telling them to go into the house, and then telling them to stay outside.

Mantovani Dep. at 60; *see also* Beckwith Dep. at 42–44 (discussing clearing calls as

"unfounded" but not naming why); Dispatch Recs. at 15:06 (noting "no police resp"),

---

[6] Plaintiff denies that he was drinking that day, but then also admits to
hearing himself on a recording of the 911 call saying that he had "too much to
drink."  Pl.'s Dep. at 73, 77.  The dispatch records are referenced for fact that the
information was reported to the officers, not for whether Plaintiff was intoxicated.
*See generally* Dispatch Recs.  *See, e.g., Thorpe v. City of New York*, No. 19-CV-5995
(CM)(RWL), 2021 WL 3811238, at *1 n.2 (S.D.N.Y. Aug. 25, 2021) ("This assertion
of undisputed fact is accepted, not for the truth of the matter, but for the fact that
this information was reported to the Harlem Hospital Police . . . . [T]he only
relevant fact is that the police were called to come to the hospital room after visiting
hours and they found plaintiff there.").

15:17 (noting to "not send units"), 15:25 (noting "advised no police resp"), 16:42 (noting "no police resp").

Dispatch records indicate that around 4:47 p.m., Plaintiff was "threatening to do something to the [precinct] that is 4 houses down from his house," Dispatch Recs. at 16:47, (although the records do not provide any further indication as to what was meant by "do something") and categorized the call as a "[h]arassment in progress." *Id.* at 16:46. The records do not indicate anything further about the nature of Plaintiff's alleged harassment. *See id.* According to Officer Mantovani, he and Beckwith went back to Plaintiff's house a third time — though based on records and Beckwith's testimony, it could have been a fourth or fifth time — after learning that he "was threatening the 911 operators" because the desk operators wanted them to warn him that "if he continued to call making these threats over the phone . . . he would be arrested for aggravated harassment." Mantovani Dep. at 62–63.

Plaintiff continued to call 911, and around or sometime after 6:50 p.m., Officers Beckwith and Mantovani returned to Plaintiff's porch. *See* Dispatch Recs. at 18:08, 18:30; Beckwith Dep. at 46–47. According to Mantovani, when they returned to his porch, he and Beckwith had not left the vicinity yet. Mantovani Dep. at 69–71. It is not clear how many times the officers visited Plaintiff, and what followed their final encounter at 6:50 p.m. is hotly contested.

## II.    Plaintiff's Arrest

Officers Beckwith and Mantovani claim that when they arrived at Plaintiff's house, Plaintiff responded with profanity and insults. Beckwith Dep. at 63;

Mantovani Dep. at 65. Plaintiff claims to have no memory of the specific content of any conversations he had with Beckwith and Mantovani. Pl.'s Dep. at 83–84. However, Plaintiff denies that he yelled or cursed at the officers. Pl.'s Dep. at 85–86.

Instead, Plaintiff claims that the officers "came up to [him]," *id.* at 85, while he was standing on the porch outside his front door, near the top of a set of stairs that led down to a walkway. *Id.* at 83–85, 97–98. He "thought they were going to say, ['w]e're going to leave you now['] and give [him] their hand and shake [his] hand, and next thing [he] knew, [he] was flying through the air." *Id.* at 85. He also claims that both officers touched him "at the same time," put their hands on his neck and "threw" him. *Id.* at 97. He denies pushing the officers at all. *Id.* at 97. According to Plaintiff, they then put "their knee in [his] back and put [his] hands behind [him] and handcuffed" him. *Id.* at 99. Then, he testified that:

> After they put the handcuffs on me they picked me up and they threw me backwards on the steps and it hurt my back, so I was moving around trying to straighten myself out with my hands behind me, and one cop just said to the other one, it looks like he needs to be repositioned on the steps, and they did it again . . . .

*Id.* at 101. At his 50-H hearing, Plaintiff testified that the officers "never said a word" about arresting him and that "[t]hey just put their gloves on and attacked" him. Pl.'s 50H Tr. at 2. He further testified: "I thought they were going to say okay. And they walked up to me and I thought that's all it was. And the next thing I know I was on the ground." *Id.*

Mantovani and Beckwith describe this interaction in starkly different terms. They claim that after a series of conversations with Plaintiff, Beckwith was standing on porch at the top of the steps, Plaintiff was yelling profanities, and Beckwith pointed at Plaintiff and told him to go back inside; at that point, they claim, Plaintiff pointed up at Beckwith, swiped down, and smacked Beckwith's hand out and down.  Beckwith Dep. at 80–82; Mantovani Dep. at 74–75.  Mantovani and Beckwith claim that Beckwith then told Plaintiff to turn around so that Beckwith could arrest him.  Mantovani Dep. at 77; Beckwith Dep. at 91–92.  Mantovani then claims that he attempted to assist Beckwith with the arrest by grabbing Plaintiff's left arm and putting it behind his back.  Mantovani Dep. at 77–78.  Then, according to both officers, Plaintiff's pushing started to carry all three of them down the steps.  Mantovani Dep. at 79–81, 96–97; Beckwith Dep. at 94–96.  Mantovani then claims that he began to fall, grabbed on to Plaintiff behind Plaintiff's head, then missed a step and injured his ankle.   Mantovani Dep. at 79–81, 83–84, 96–97.  The officers then claim that Beckwith and Plaintiff fell off the stairs.  Beckwith Dep. at 96; Mantovani Dep. at 83–84.

According to both officers, Plaintiff was then rolling on the ground and Mantovani "sat him back down."  Mantovani Dep. at 100; Beckwith Dep. at 100–01. Sometime after the struggle and while Plaintiff was still on the floor, Beckwith handcuffed Plaintiff.  Mantovani Dep. at 98–99; Beckwith Dep. at 98–99, 189. According to Beckwith, non-defendant Sergeant O'Neill arrived and helped bring

9

Plaintiff to the police car, at which point Plaintiff kicked Beckwith in the shin. Beckwith Dep. at 102–04.  Plaintiff denies kicking the officers.  Pl.'s Dep. at 116–17.

According to Mantovani, Mantovani went to the hospital and was discharged, and they told him he had a sprained ankle.  Mantovani Dep. at 110.

Beckwith prepared the felony complaint and misdemeanor information, in which Plaintiff was charged with harassment in the second degree (N.Y. Penal Law § 240.26(1)), assault in the second degree (N.Y. Penal Law § 120.05(3)), and resisting arrest (N.Y. Penal Law § 205.30).  *See* Charging Docs. Defs.' Ex. K ("Info. & Compl."), ECF No. 107-12.

In support of the charge of harassment, Beckwith stated that Plaintiff "did, with intent to alarm [him], slap [his] outstretched hand while [he] was giving [Plaintiff] lawful orders to back away from police officers conducting a police investigation."  *Id.* at 5.

In support of the charge of assault in the second degree, Beckwith stated that Plaintiff,

> after being advised that he was under arrest by Officers Beckwith and Mantovani and to place his hands behind his back, did violently flail his arms, kick and scream and push Officer Mantovani down 4 steps on the exterior of his home.  As a result of stumbling down 4 steps, PO Mantovani did suffer pain and swelling to his left wrist and back, small lacerations to his hands, and substantial pain and swelling to his left ankle which was subsequently diagnosed as sprained after receiving medical treatment at South Nassau Communities Hospital.

*Id.* at 2–3.

In support of the charge of resisting arrest, Beckwith stated that Plaintiff:

did intentionally prevent police officers from performing an official function by refusing to comply with a lawful order of the police to place his hands behind his back and submit to an arrest for slapping [Beckwith's] outstretched hand while [he] was giving [Plaintiff] lawful orders to back away from police officers conducting a police investigation. When officers attempted to place [Plaintiff] under arrest he violently flailed his arms, kicked, screamed and pushed Officer Mantovani down 4 steps, and refused to comply with lawful orders. As a result, Police Officer Mantovani sustained cuts, scrapes and a sprained ankle.

*Id.* at 4.[7]

Plaintiff was jailed for three days and released after posting a bond of $10,000.

Pl.'s Ex. Q ("Order to Discharge"), ECF No. 108-18; *see also* Pl.'s Dep. at 122–24;

Compl. ¶ 35.

### III.   Defendants' Meetings with the DA's Office and Ultimate Dismissal

Both arresting officers were contacted by the Nassau County District

Attorney's Office ("DAO") multiple times while the charges against Plaintiff were

pending.  Beckwith Dep. at 107; Mantovani Dep. at 53–55.  During the meetings

with the DAO, the officers watched video footage of the arrest that was captured by

Plaintiff's camera on his porch.  Mantovani Dep. at 55.  The video does not capture

sound.  Pl.'s Dep. at 89.

According to Mantovani, during meetings with the District Attorney's office,

Mantovani gave the DAO his "side of the story," Mantovani Dep. at 56, and "told

them to proceed with the felony," because he "wanted [Plaintiff] to be convicted a

---

[7] According to the Certificate of Disposition, Plaintiff seems to also have been eventually charged with a violation of assault in the third degree, although the record is unclear as to when he was charged and the basis of that charge. *See* Certificate of Disposition Pl.'s Ex. E, ECF No. 108-6.

felony." *Id.* at 129.  When he found out the DAO was dismissing the charges, he testified that he was not "okay with the dismissal because [he] wanted [Plaintiff] to be prosecuted." *Id.* at 130.

On January 29, 2018, the charges were dismissed. *See* Certificate of Disposition.  Before the charges were dismissed, Plaintiff had to go to court "more than one time." Pl.'s 50H Tr. at 4.

Plaintiff filed suit on February 7, 2018.  Compl.  He seeks damages for, *inter alia*, physical injuries, mental damages, and violation of his rights, and contends that he sustained extensive physical injuries when Officers Beckwith and Mantovani grabbed him by the neck and "threw" him down the stairs. *See id.* ¶¶ 6, 23, 31, 33, 54.  In this action, Plaintiff relies heavily not just on his own testimony, but on the video recording of his interactions with Defendant officers. *See id.* ¶ 27. He contends that Beckwith and Mantovani were unaware that Plaintiff had a security camera on his porch that, unbeknownst to them, recorded their interactions on February 7, 2017. Pl.'s Opp. at 12–13.  Plaintiff submits that the video recording corroborates his account of having been subjected to an unprovoked physical assault by the officers on the steps of his own home, and that — before they were aware of the video's existence — Defendants falsely arrested Plaintiff, and thereafter continued to urge prosecutors to pursue baseless criminal charges against him to cover up their unlawful actions. *Id.* at 13–14.  Plaintiff also contends that the charges against him were dismissed because the video evidence revealed that the

individual Defendants' earlier accounts of these events were replete with "lie[s]." *Id.* at 22–23.

For their part, Defendants deny having physically assaulted Plaintiff and arresting him without probable cause. Defs.' Mem. at 15–18. And while they do not contest that the record contains disputes of material fact that entitle Plaintiff to a trial on his allegation that the officers unreasonably used physical force against him on the night of his arrest, they maintain that no reasonable jury could find that either his arrest or prosecution were unlawful under either the United States Constitution or New York law, and seek summary judgment on those claims. *Id.* at 15–21. Defendants also submit that, to the extent the Court allows Plaintiff to proceed with his false arrest claims against the individual Defendants under § 1983, the officers had at least "arguable probable cause" to arrest him, *see, e.g.*, *Soukaneh v. Andrzejewski*, No. 21-2047, 2024 WL 3747703, at *9 (2d Cir. Aug. 12, 2024), and thus are entitled to qualified immunity as a matter of law. Defs.' Mem. at 16–18, 31–32.

## **LEGAL STANDARD**

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A dispute about a 'genuine issue' exists for summary judgment purposes where the evidence is such that a reasonable jury could decide in the non-movant's favor." *Beyer v. County of Nassau*, 524 F.3d 160, 163 (2d Cir. 2008) (quoting *Guilbert v. Gardner*, 480 F.3d 140, 145 (2d Cir. 2007)).

A fact is material "when its resolution 'might affect the outcome of the suit under the governing law.'" *SCW W. LLC v. Westport Ins. Corp.*, 856 F. Supp. 2d 514, 521 (E.D.N.Y. 2012) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). In considering a summary judgment motion, the Court "is required to view the record in the light most favorable to the party against which summary judgment is contemplated and to resolve all ambiguities and draw all factual inferences in favor of that party." *NetJets Aviation, Inc. v. LHC Commc'ns, LLC*, 537 F.3d 168, 178 (2d Cir. 2008).

"The moving party has the initial burden of demonstrating the absence of a disputed issue of material fact." *Thorpe*, 2021 WL 3811238, at *4 (citing *Celotex v. Catrett*, 477 U.S. 317, 323 (1986)). "Once such a showing has been made, the non-moving party must present 'specific facts showing that there is a genuine issue for trial.'" *Id.* (quoting Fed. R. Civ. P. 56(e)). "The party opposing summary judgment 'may not rely on conclusory allegations or unsubstantiated speculation.'" *Id.* (quoting *Scotto v. Almenas*, 143 F.3d 105, 114 (2d Cir. 1998)). "Finally, the nonmoving party 'must do more than simply show that there is some metaphysical doubt as to the material facts.'" *Id.* (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)). "To withstand a summary judgment motion, sufficient evidence must exist upon which a reasonable jury could return a verdict for the nonmovant." *Id.*

## DISCUSSION

Defendants move for partial summary judgment on Plaintiff's § 1983 false

arrest, malicious prosecution, and abuse of process claims, as well as his negligence

due process, and § 1983 municipal liability claims.  For the reasons stated below,

the Court denies Defendants' motion as to Plaintiff's § 1983 false arrest, malicious

prosecution, and abuse of process claims.  The Court grants summary judgment as

to Plaintiff's due process, negligence, and § 1983 municipal liability claims.

## I.      False Arrest

"An arrest undertaken without a warrant 'must be supported by probable

cause or else it violates the Fourth Amendment.'" *Kayo v. Mertz*, 531 F. Supp. 3d

774, 788 (S.D.N.Y. 2021) (quoting *United States v. Valentine*, 539 F.3d 88, 93 (2d

Cir. 2008)).  As such, Plaintiff's "§ 1983 claim for false arrest derives from his

Fourth Amendment right to remain free from unreasonable seizures, which includes

the right to remain free from arrest absent probable cause." *Jaegly v. Couch*, 439

F.3d 149, 151 (2d Cir. 2006) (citing *Weyant v. Okst*, 101 F.3d 845, 852 (2d Cir.

1996)).  "In analyzing § 1983 claims for unconstitutional false arrest," the Second

Circuit has "generally looked to the law of the state in which the arrest occurred."

*Id.* at 151 (quoting *Davis v. Rodriguez*, 364 F.3d 424, 433 (2d Cir. 2004)).

"Under New York law, a plaintiff claiming false arrest must show, *inter alia*,

that the defendant intentionally confined him without his consent and without

justification." *Weyant*, 101 F.3d at 852.  Relevant here, "[t]he existence of probable

cause to arrest constitutes justification and 'is a complete defense to an action for

false arrest,' whether that action is brought under state law or under § 1983.'" *Id.* (quoting *Bernard v. United States*, 25 F.3d 98, 102 (2d Cir. 1994)); *see also Jaegly*, 439 F.3d at 152 ("Under New York law, the existence of probable cause is an absolute defense to a false arrest claim."). Thus, "a plaintiff cannot recover damages on a § 1983 false arrest claim for an arrest that was supported by probable cause." *Guan v. City of New York*, 37 F.4th 797, 805 (2d Cir. 2022).

Probable cause to arrest is "[m]ore demanding than reasonable suspicion" and "exists when the officers have knowledge of, or reasonably trustworthy information as to, facts and circumstances that are sufficient to warrant a person of reasonable caution in the belief that an offense has been or is being committed by the person to be arrested." *Soukaneh*, 2024 WL 3747703, at *7 (quoting *Zellner v. Summerlin*, 494 F.3d 344, 368 (2d Cir. 2007)). "At the summary judgment stage, '[t]he question of whether or not probable cause existed may be determinable as a matter of law if there is no dispute as to the pertinent events and the knowledge of the officers.'" *Smith*, 2021 WL 4267525, at *8 (quoting *Weyant*, 101 F.3d at 852). However, "where material facts on which such events and knowledge turn are disputed, summary judgment is not appropriate." *Kayo*, 531 F. Supp. 3d at 789 (citing *Weyant*, 101 F.3d at 852); *see also Cooper v. Dieugenia*, No. 14-CV-6136 (PKC), 2017 WL 818367, at *5 (E.D.N.Y. Feb. 27, 2017) ("When the issue of probable cause is 'predominantly factual in nature,' it is appropriate for the jury to decide." (first quoting *Barksdale v. Colavita*, 506 F. App'x 82, 84 (2d Cir. 2012); then citing *Jeffreys v. City of New York*, 426 F.3d 549, 553–54 (2d Cir. 2005))).

With these principles in mind, the Court will now address whether, as a matter of law, the record establishes that Defendants had probable cause to arrest Plaintiff (in other words, that no reasonable jury could find that Defendants lacked probable cause to believe Plaintiff was guilty of a crime), beginning with the harassment charge.

### A. Harassment in the Second Degree

Under New York law, a "person is guilty of harassment in the second degree when, with intent to harass, annoy or alarm another person: He or she strikes, shoves, kicks or otherwise subjects such other person to physical contact, or attempts or threatens to do the same." *Smith*, 2021 WL 4267525, at *12 (quoting N.Y. Penal Law § 240.26(1)). "The crux of section 240.26(1) is the element of physical contact: actual, attempted or threatened." *Id.* (quoting *People v. Bartkow*, 749 N.E.2d 158, 159 (2001)); *see also Mosby v. City of New York*, No. 20 Civ. 1485 (AT), 2022 WL 4095931, at *4 (S.D.N.Y. Sept. 7, 2022) ("There is a 'physical contact element' to harassment." (quoting *People v. Canjura*, 2 N.Y.S.3d 724, 727 (N.Y. App. Div. 2d Dep't 2014))). "The statute covers 'petty forms of offensive touching' that do not rise to the level of assault." *Smith*, 2021 WL 4267525, at *12 (quoting *Bartkow*, 749 N.E.2d at 159).

Here, there are disputes of material fact related to whether there was probable cause to arrest and charge Plaintiff with harassment in the second degree. Defendants argue that the officers had probable cause to arrest Plaintiff based on the following:

> Officers Beckwith and Mantovani were repeatedly informed by 911 operators that plaintiff was harassing and verbally abusing the 911 operators by yelling and cursing at them, and threatening them. When the officers responded to plaintiff's house, they personally observed him to be belligerent and intoxicated. Despite being warned that he would be arrested for harassment if he continued to call 911 when there was no emergency, plaintiff continued to place calls to 911 and berate both the operators and the responding officers. His belligerent conduct came to a head when he began yelling and cursing at the officers and hitting the door. **He then smacked Officer Beckwith's arm**.

Defs.' Mem. at 6 (emphasis added).

Defendants' theory of why they had probable cause to arrest Plaintiff for harassment in the second degree hinges on their claim that Plaintiff initiated unlawful contact with them when he "smacked" Beckwith. Yet Plaintiff claims that Beckwith and Mantovani threw him down the stairs without provocation before arresting him, and he flatly denies that he "smacked" Beckwith's arm or initiated any physical contact with either of the officers before that time. Pl.'s Dep. at 97–101.

A reasonable jury could credit Plaintiff's account and find that he did not "smack" Beckwith. That is particularly so because — having reviewed the footage from Plaintiff's porch camera that recorded the parties' interaction — the Court concludes that a jury could agree with Plaintiff's contention that the video of the incident corroborates his account and contradicts the officers'. In other words, this is not a case in which the video "so utterly discredits [Plaintiff's] version that no reasonable juror could fail to believe the version advanced by the moving party." *Zellner*, 494 F.3d at 371. And even if a jury were to find that Plaintiff initiated some contact with Beckwith by pushing the officer's hand away from his arm, these

18

competing accounts and the video evidence creates a question of fact as to whether he did so "with intent to harass, annoy or alarm" him under N.Y. Penal Law § 240.26 or whether, instead, he had an instinctive and proportionate reaction to Beckwith's conduct that did not constitute a crime under the circumstances.  That is particularly so because, under New York law, "[t]he crux of section 240.26(1) is the element of physical contact: actual, attempted or threatened."  *Smith*, 2021 WL 4267525, at *12; *see, e.g.*, *Mosby*, 2022 WL 4095931, at *4 (denying summary judgment on probable cause to arrest for harassment in the second degree where there was dispute on physical contact by plaintiff and defendant officer and where it is "unclear" in the video); *Kayo*, 531 F. Supp. 3d at 785, 792–93 (denying summary judgment on probable cause harassment in the second degree where "parties dispute the characterization of [plaintiff's] action toward [officer]" where plaintiff "contends that he did not expect to be touched and reacted instinctively").

Accordingly, material disputes of fact preclude a finding on summary judgment that the officers had probable cause to arrest Plaintiff for harassment in the second degree.  For that reason, the Court denies summary judgment as to Plaintiff's false arrest claim under § 1983 and his state law false arrest claim.

### B. Assault in the Second Degree

The relevant elements of assault in the second degree are that, with intent to prevent a peace officer from doing their job, the defendant causes physical injury to the police officer.  *See Thorpe*, 2021 WL 3811238, at *3 n.4 (citing N.Y. Penal Law

§ 120.05(3)).  "Unlike assault in the second degree on a civilian, the attack does not need to result in 'serious physical injury.'"  *Id.*

Here, the parties' conflicting versions of whether Plaintiff smacked Beckwith's hand create a dispute of material fact as to whether there was probable cause to arrest and charge Plaintiff with assault in the second degree. Again, Plaintiff claims that Beckwith and Mantovani threw him down the stairs without provocation before arresting him, and he flatly denies that he "smacked" Beckwith's arm or initiated any physical contact with either of the officers before that time. Pl.'s Dep. at 97–101.  A reasonable jury could credit Plaintiff's account and find that no assault on either officer occurred.  *See, e.g.*, *Thorpe*, 2021 WL 3811238, at *8 (denying summary judgment on false arrest claim because Plaintiff and officer disputed whether Plaintiff had actually hit officer and finding that issue of probable cause of assault "must be tried"); *Polanco v. City of New York*, No. 14 Civ. 7986 (NRB), 2018 WL 1804702, at *7 (S.D.N.Y. Mar. 28, 2018) ("[W]e find that there are issues of fact that cannot be resolved on this summary judgment motion as to whether there was probable cause to prosecute plaintiff for . . . assaulting a police officer . . . .").  Thus, summary judgment is not appropriate here.

### C. Resisting Arrest

Under New York law, "[a] person is guilty of resisting arrest when he intentionally prevents or attempts to prevent a police officer . . . from effecting an authorized arrest of himself or another person."  N.Y. Penal Law § 205.30. As the Second Circuit has observed, "[i]t is well established in New York that 'probable

cause to arrest is a prerequisite for making an authorized arrest,' and if there is no probable cause to arrest a person, that person 'cannot be guilty of resisting arrest.'" *Curry v. City of Syracuse*, 316 F.3d 324, 336 (2d Cir. 2003) (quoting *People v. Mohamadou*, 698 N.Y.S.2d 445, 447–48 (N.Y. Crim. Ct. 1999)).  Accordingly, "[r]esisting arrest on its own cannot constitute probable cause to arrest."  *Walker v. Carrozzo*, 664 F. Supp. 3d 490, 514 (S.D.N.Y. 2023); *see also Dancy v. McGinley*, 843 F.3d 93, 113 n.17 (2d Cir. 2016) ("Because there was no arguable probable cause to arrest [plaintiff] for obstruction of governmental administration, there was also no probable cause to arrest for *resisting* that arrest."); *Kayo*, 531 F. Supp. 3d at 794 ("With the Court's having found that material disputes of fact preclude summary judgment as to whether there was probable cause to arrest, such disputes necessarily preclude finding probable cause for resisting arrest.").

Thus, because there are disputed issues of material fact that preclude a finding that the officers had probable cause on the assault and harassment charges, the Court cannot find that, as a matter of law, the officers had probable cause to arrest Plaintiff on the resisting arrest charges.

### D. Qualified Immunity on Plaintiff's False Arrest Claims: Whether Defendants Had "Arguable Probable Cause"

Defendants Beckwith and Mantovani contend that even if this Court finds that summary judgment is not appropriate on Plaintiff's false arrest claims, these claims should nonetheless be dismissed before trial because the individual Defendants have established, as a matter of law, that they are entitled to qualified immunity on this claim.  *See, e.g., Clark v. City of New York*, No. 09 CV 2533 (PKC),

2015 WL 5719612, at *7 (E.D.N.Y. Sept. 29, 2015) ("Though the Court has found an issue of fact exists with respect to whether the City Defendants had probable cause to arrest [plaintiff], summary judgment might still be appropriate if defendants can demonstrate that they are entitled to qualified immunity." (quotation omitted)).[8]

"[Q]ualified immunity is available where officers of reasonable competence could disagree on whether the probable cause test was met, *i.e.*, where the existence of probable cause for an arrest was at least reasonable and arguable, even if mistaken." *Rupp v. Buffalo*, 91 F.4th 623, 642 (2d Cir. 2024) (citations and quotation omitted). "Arguable probable cause 'exists when a reasonable police officer in the same circumstances and possessing the same knowledge as the officer in question *could* have reasonably believed that probable cause existed in the light of well-established law.'" *Soukaneh*, 2024 WL 3747703, at *9 (quoting *Lee v. Sandberg*, 136 F.3d 94, 102 (2d Cir. 1997)).

However, "'[a]rguable' probable cause should not be misunderstood to mean 'almost' probable cause." *Jenkins v. City of New York*, 478 F.3d 76, 87 (2d Cir. 2007). "Because qualified immunity is an affirmative defense, defendants bear the burden of proving arguable probable cause." *Kayo*, 531 F. Supp. 3d at 789–90 (citing *Jackler v. Byrne*, 658 F.3d 225, 242 (2d Cir. 2011)). The Second Circuit has "repeatedly held that 'disputed material issues regarding the reasonableness of an

---

[8] Defendants limit their qualified immunity argument at summary judgment to Plaintiff's false arrest claims. *See* Defs.' Mem. at 31–32. The individual Defendants remain free, however, to assert qualified immunity as to any of Plaintiff's federal constitutional claims against them at trial.

officer's perception of the facts (whether mistaken or not) [are] the province of the jury.'" *Moran v. Greco*, No. 23-901, 2024 WL 1597624, at *4 (2d Cir. Apr. 12, 2024) (quoting *Jones v. Treubig*, 963 F.3d 214, 225 (2d Cir. 2020)).

Here, given the parties' disputes over key facts and the absence of other material information, the Court cannot determine, as a matter of law, whether officers of reasonable competence could disagree on whether the probable cause test was met. *See e.g.*, *Curry*, 316 F.3d at 337 (finding no qualified immunity because "[g]enuine issues of material fact exist as to whether [defendant] had probable cause to arrest [plaintiff] for any reason prior to the struggle between [them] when [plaintiff] resisted arrest"); *Kayo*, 531 F. Supp. 3d at 795 ("Because the 'record plainly reveals the existence of genuine issues of material fact relating to the qualified immunity defense,' the Court denies defendants' motion for summary judgment on this basis." (quoting *Hurlman v. Rice*, 927 F.2d 74, 82 (2d Cir. 1991))).

As discussed above, the conflicting versions of whether Plaintiff "smacked" Beckwith's hand creates a dispute of material fact as to whether there was probable cause to arrest and charge Plaintiff with assault in the second degree. Again, Plaintiff claims that Beckwith and Mantovani threw him down the stairs without provocation before arresting him, and he flatly denies that he "smacked" Beckwith's arm or initiated any physical contact with either of the officers before that time. Pl.'s Dep. at 97–101. A reasonable jury could credit Plaintiff's account and find that no assault on either officer occurred. In addition, if a jury were to find that Plaintiff initiated some contact with Beckwith by pushing the officer's hand away from his

arm, these competing accounts and the video evidence creates a question of fact as to whether he did so "strike" Beckwith, "with intent to harass, annoy or alarm" him under harassment in the second degree or whether, instead, he had an instinctive and proportionate reaction to Beckwith's conduct that did not constitute a crime under the circumstances, particularly because, as stated above, "[t]he crux of section 240.26(1) is the element of physical contact: actual, attempted or threatened." *Smith*, 2021 WL 4267525, at *12.

If the jury were to credit Plaintiff's account over the officers, even "arguable probable cause" would be lacking. In other words, no reasonable officer in the same circumstances and possessing the same knowledge as Beckwith and Mantovani could have reasonably believed that probable cause existed to arrest a seventy-one-year-old man for assault, harassment, and resisting arrest where the man did not smack or push the officer, and where the officers responded to their verbal interactions by violently throwing that man down the stairs. In other words, under those circumstances, a jury could conclude that a reasonably competent officer would have lacked even arguable probable cause to arrest Plaintiff on any of the grounds articulated by Defendants, making Plaintiff's arrest a violation of a clearly established constitutional right. *See, e.g.*, *Mosby*, 2022 WL 4095931, at *4–5 (denying qualified immunity on false arrest because issue of fact as to whether there was "any contact or attempted contact" between plaintiff and defendant officer was material to whether there was arguable probable cause to arrest for harassment in the second degree); *Thorpe*, 2021 WL 3811238, at *8 (denying

24

qualified immunity on false arrest claim because parties disputed whether plaintiff had actually hit officer was material to whether there was arguable probable cause to arrest for assault in the second degree); *Clark*, 2015 WL 5719612, at *7 (denying qualified immunity on plaintiff's false arrest claims due to disputed issues of material fact regarding probable cause).

Accordingly, the individual Defendants' motion for summary judgment as to false arrest claims against them is denied.

## II.   Malicious Prosecution

"To prevail on a Section 1983 claim for malicious prosecution, a plaintiff must establish the elements of a malicious prosecution claim under state law and show a violation of his rights under the Fourth Amendment." *Soomro v. City of New York*, 174 F. Supp. 3d 806, 813 (S.D.N.Y. 2016) (citing *Fulton v. Robinson*, 289 F.3d 188, 195 (2d Cir. 2002)). "To establish a claim of malicious prosecution under New York law, a plaintiff must prove: '(1) the initiation or continuation of a criminal proceeding against plaintiff; (2) termination of the proceeding in plaintiff's favor; (3) lack of probable cause for commencing the proceeding; and (4) actual malice as a motivation for defendant's actions.'" *Id.* at 814–15 (quoting *Murphy v. Lynn*, 118 F.3d 938, 947 (2d Cir. 1997)). In addition, "when pressing a malicious prosecution claim under § 1983, the plaintiff must show also 'that there was (5) a sufficient post-arraignment liberty restraint to implicate [his] Fourth Amendment rights.'" *Giles v. City of Mt. Vernon*, No. 20-CV-05119 (PMH), 2024 WL 126883, at *6 (S.D.N.Y. Jan.

11, 2024) (quoting *Rohman v. New York City Transit Auth.*, 215 F.3d 208, 215 (2d Cir. 2000)).

Defendants are silent as to — and therefore do not dispute — whether Plaintiff satisfies the first second, fourth, and fifth prongs of this test (that is, that the proceedings were dismissed in Plaintiff's favor, that they acted with malice, and that there was a sufficient post-arraignment liberty restraint to implicate his Fourth Amendment rights). However, they argue that the existence of probable cause for harassment, resisting arrest, and assault in the second degree bars Plaintiff's malicious prosecution claims against both officers. Defs.' Mem. at 7–10; Defs.' Reply at 4. They also argue that Plaintiff's malicious prosecution against Officer Mantovani should be dismissed because he did not initiate or commence the criminal proceedings against Plaintiff. Defs.' Mem. at 7.

### A. Probable Cause

The same disputes of material fact that foreclose a determination that, as a matter of law, there was probable cause to arrest Plaintiff for any of the charges similarly foreclose Defendants' motion for summary judgment on this claim. That is particularly so because "[t]he probable cause standard in the malicious prosecution context is slightly higher than the standard for false arrest cases." *Stansbury v. Wertman*, 721 F.3d 84, 95 (2d Cir. 2013) (citing *Boyd v. City of New York*, 336 F.3d 72, 76 (2d Cir. 2003)). "Probable cause, in the context of malicious prosecution, has also been described as such facts and circumstances as would lead a reasonably prudent person to believe the plaintiff guilty." *Id.* (quoting *Boyd*, 336 F.3d at 74,

77).  Taking Plaintiff's account as true — that the officers fabricated a story that Plaintiff "smacked" and pushed the officers to justify their own unlawful use of force against him — a jury could find that a reasonably prudent person would not believe that Plaintiff was guilty of harassment and assault.  And without probable cause to arrest for harassment and assault, there would be no probable cause for the charge of resisting arrest.

### B. Initiation and Continuation of Charges

"[T]here is a presumption that a prosecutor exercises independent judgment in deciding whether to initiate and continue a criminal proceeding." *Abusikin v. City of New York*, No. 18 Civ. 4582 (AT), 2021 WL 930349, at *8 (S.D.N.Y. Mar. 11, 2021) (quoting *Espada v. Schneider*, 522 F. Supp. 2d 544, 553 (S.D.N.Y. 2007)).  "In the case of police officers, however, that presumption is overcome 'where the defendant-officer brought formal charges and had the person arraigned, filled out complaining and corroborating affidavits, swore to and signed a felony complaint, *or created false information and forwarded it to prosecutors.*'"  *Id.* (emphasis added) (quoting *Cambisaca v. Ruhe*, No. 17 Civ. 87, 2019 WL 2866072, at *6 (S.D.N.Y. July 3, 2019)); *see also Cameron v. City of New York*, 598 F.3d 50, 63 (2d Cir. 2010) ("[P]olice officers can 'initiate' prosecution by filing charges or other accusatory instruments.").  In other words, "[t]o initiate a prosecution, [an officer] must do more than report the crime or give testimony.  He must 'play[] an active role in the prosecution, such as giving advice and encouragement or importuning the

authorities to act.'" *Manganiello v. City of New York*, 612 F.3d 149, 163 (2d Cir. 2010) (quoting *Rohman*, 215 F.3d at 217).

"Like a prosecutor's knowing use of false evidence to obtain a tainted conviction, a police officer's fabrication and forwarding to prosecutors of known false evidence works an unacceptable 'corruption of the truth-seeking function of the trial process.'" *Id.* at 162 (quoting *Ricciuti v. New York City Transit Auth.*, 124 F.3d 123, 130 (2d Cir. 1997)). As one court has observed, "[n]early all cases in which law enforcement officers were found to have initiated or continued a prosecution for purposes of a malicious prosecution claim involve officers who provided knowingly false and/or fabricated evidence to unwitting prosecutors." *Joyner v. County of Cayuga*, No. 20-CV-60 (MAD/TWD), 2020 WL 1904088, at *8 (N.D.N.Y. Apr. 17, 2020) (citing *Ricciuti*, 124 F.3d at 130; *Ramos v. City of New York*, 729 N.Y.S.2d 678 (App. Div. 1st Dep't 2001)).

Plaintiff has met his burden of showing that there is a dispute of material fact as to this element of his malicious prosecution claim. If a jury believes Plaintiff's version of the facts — that Beckwith and Mantovani fabricated their account to prosecutors so that Plaintiff would be convicted of assault, harassment, and resisting arrest — then a jury could find that (1) Beckwith initiated the prosecution when he falsified a story in the charging documents and (2) both Beckwith and Mantovani took steps to continue the prosecution when they repeated those fabrications in his various conversations with the DAO.

In support of the harassment charge, Beckwith stated that Plaintiff "did, with intent to alarm [him], *slap [his] outstretched hand* while [he] was giving [Plaintiff] lawful orders to back away from police officers conducting a police investigation." Info. & Compl. at 5 (emphasis added). In support of the resisting arrest charge, Beckwith stated that "[w]hen officers attempted to place [Plaintiff] under arrest he *violently flailed his arms, kicked*, screamed and *pushed Officer Mantovani down 4 steps*, and refused to comply with lawful orders." *Id.* at 4 (emphasis added). And in support of the assault charge, Beckwith repeated that Plaintiff "did *violently flail his arms, kick* and scream and *push Officer Mantovani down 4 steps* on the exterior of his home." *Id.* at 2–3 (emphasis added). However, taking Plaintiff's as true — which the Court must do at this stage, unless it is wholly contradicted by other undisputed evidence in the record — the jury could find that Beckwith's assertions (particularly that Plaintiff "violently . . . push[ed] . . . Mantovani down [the] steps," *id.* at 4) were fabricated. *See, e.g.*, *Abusikin*, 2021 WL 930349, at *8–9 (finding officer could be liable under first prong of malicious prosecution claim of initiating a prosecution for providing false information in signed criminal complaint); *Polanco*, 2018 WL 1804702, at *8 (denying summary judgment on malicious prosecution claim where "[m]aking all inferences in plaintiff's favor, the assault charges, for which there are issues of fact as to whether there was probable cause to prosecute, were initiated based on false information provided by [defendant officers]"); *Douglas v. City of New York*, 595 F. Supp. 2d 333, 342 (S.D.N.Y. 2009) ("If any of the defendants misled the prosecutor

29

by providing false statements regarding plaintiff's conduct, however, then they could be liable for malicious prosecution. Here, that is precisely what plaintiff alleges, and if a jury credits plaintiff's testimony, it could reasonably conclude that defendants initiated a proceeding against him.").

Similarly, as to Mantovani, during meetings with the DAO, Mantovani gave the DAO his "side of the story" and even "told them to proceed with the felony," because he "wanted [Plaintiff] to be convicted of a felony." Mantovani Dep. at 129. Given that Mantovani's "side of the story," *id.*, is in direct contradiction with Plaintiff's as it relates to the core acts that underlie the charges of resisting arrest, assault, and harassment, a jury that credited Plaintiff's account could also find that Mantovani gave fabricated statements to the prosecutor in order to seek Plaintiff's conviction.

With respect to Mantovani, Defendants contend that all malicious prosecution claims against him must be dismissed because only Beckwith swore out the criminal complaint against Plaintiff, while Mantovani was receiving outpatient treatment for pain in his ankle after the arrest. Defs.' Mem. at 7. Defendants fail to account for the fact that on his malicious prosecution claim, Plaintiff may still proceed against Mantovani based on his contention that Mantovani played a role in "continuation" of the criminal charges against him during the eleven months they were pending, from the date of he was arrested on February 7, 2017, to when they were eventually dismissed on January 28, 2018. *See, e.g.*, *Delanuez v. City of Yonkers*, No. 20 Civ. 4476 (PED), 2022 WL 16540682, at *7 (S.D.N.Y. Oct. 28, 2022)

(finding that "[a]lthough [defendant detective] was not involved in the initiation of [plaintiff's] prosecution, he was involved with the continuation of [plaintiff's] prosecution" because he "testified falsely at the suppression hearing"); *Cooper v. City of New York*, No. 14-CV-1761(RJD)(RML), 2018 WL 5115565, at *9 (E.D.N.Y. Oct. 11, 2018) (finding that two defendant officers "assisted in the continuation of [plaintiff's] prosecution . . . by discussing their respective roles in [plaintiff's] arrest and reviewing their anticipated testimony with assistant district attorneys"); *Birch v. Danzi*, No. 18-CV-839 (PKC) (LB), 2018 WL 3613016, at *6 (E.D.N.Y. July 26, 2018) (finding that plaintiff sufficiently alleged that defendant officers initiated or continued prosecution where one "prepar[ed] an allegedly falsified confession and forward[ed] it to the prosecutor," and others "lied during the suppression hearing"); *see also Bermudez v. City of New York*, 790 F.3d 368, 377 (2d Cir. 2015) ("[A] claim for malicious prosecution can still be maintained against a police officer if the officer is found to play[] an active role in the prosecution, such as giving advice and encouragement or importuning the authorities to act." (alteration and quotation omitted)).

As previously mentioned, according to Mantovani himself, Mantovani gave the DAO his "side of the story" during meetings with the DAO, and "told them to proceed with the felony," because he "wanted [Plaintiff] to be convicted of a felony." Mantovani Dep. at 129. Given that his "side of the story" directly contradicts Plaintiff's as it relates to the assault, harassment, and resisting arrest charges — and Plaintiff intends to present the jury with evidence that, if credited, would

31

permit a finding that Mantovani's account to prosecutors was false — the jury could

reasonably find that Mantovani is liable for malicious prosecution.  Giving Plaintiff

the benefit of all favorable inferences, a jury could find that these actions

constituted more than merely answering questions by prosecutors about the

incident in question (as Mantovani was bound to do as a police officer) but instead

constituted the sort of "active role" in furthering Plaintiff's prosecution and

"importuning" prosecutors to seek a conviction that is sufficient to make him

individually liable.  Whether Mantovani actually did so is a question of fact for the

jury and makes summary judgment inappropriate.

### C. Malice, Favorable Termination, and Sufficient Post-Arraignment Liberty Restraint

Defendants do not address whether Plaintiff's charges were favorably

terminated, whether Defendant officers lacked the requisite malice for Plaintiff's

malicious prosecution claims to go to trial, or whether there was a sufficient post-

arraignment liberty restraint to implicate his Fourth Amendment right.  The Court

finds that Plaintiff's conviction was favorably terminated and there was a sufficient

post-liberty restraint for purposes of a § 1983 malicious prosecution claim and that

the question of malice should be reserved for trial because it hinges on the jury's

resolution of whether the officers had probable cause.

Starting with favorable termination, "[t]o demonstrate a favorable

termination of a criminal prosecution for purposes of [a] Fourth Amendment claim

under § 1983 for malicious prosecution, a plaintiff need only show that his

prosecution ended without a conviction." *Thompson v. Clark*, 596 U.S. 36, 39

32

(2022). Here, Plaintiff's charges were dismissed and thus favorably terminated for purposes of his § 1983 malicious prosecution claim. *See, e.g.*, *Galgano v. County of Putnam*, No. 16-CV-3572 (KMK), 2024 WL 1623401, at \*94 (S.D.N.Y. Apr. 15, 2024) ("[T]he Court concludes that because the First Indictment was dismissed, Plaintiff has sufficiently demonstrated that the proceeding terminated in his favor."); *Delanuez*, 2022 WL 16540682, at \*8 (holding that plaintiff satisfied the favorable termination of proceedings element where the indictment against him was dismissed).

Although "[t]he Supreme Court has [not decided] the question [] whether malice is an element of a malicious prosecution claim under § 1983," the Second Circuit has "held that it may be inferred from the absence of probable cause." *Thompson v. Clark*, No. 23-900-CV, 2024 WL 2720230, at \*2 n.2 (2d Cir. May 28, 2024) (summary order) (first citing *Thompson*, 596 U.S. at 44 n.3; then citing *Kee v. City of New York*, 12 F.4th 150, 167 n.17 (2d Cir. 2021)); *see also Manganiello*, 612 F.3d at 163 ("[A] lack of probable cause generally creates an inference of malice." (quoting *Boyd*, 336 F.3d at 78)).  Thus, once a court finds "an issue of material fact as to probable cause, the element of malice also becomes an issue of material fact as well." *Boyd*, 336 F.3d at 78; *see also Lowth v. Town of Cheektowaga*, 82 F.3d 563, 571 (2d Cir. 1996) ("In most cases, the lack of probable cause — while not dispositive — 'tends to show that the accuser did not believe in the guilt of the accused, and malice may be inferred from the lack of probable cause.'" (quoting *Conkey v. State of New York*, 427 N.Y.S.2d 330, 332 (N.Y. App. Div. 4th Dep't

1980))); *Weiner v. McKeefery*, 90 F. Supp. 3d 17, 37 (E.D.N.Y. 2015) ("[B]ecause there is a factual dispute as to whether plaintiff's prosecution was based on probable cause, the Court is also unable to determine whether [defendant officer] acted with actual malice . . . .").

Finally, the last element is easily satisfied, as the Second Circuit has "consistently held that a post-arraignment defendant who is 'obligated to appear in court in connection with criminal charges whenever his attendance is required' suffers a Fourth Amendment deprivation of liberty." *Swartz v. Insogna*, 704 F.3d 105, 112 (2d Cir. 2013) (alterations and quotations omitted) (citing *Murphy*, 118 F.3d at 947; *Jocks v. Tavernier*, 316 F.3d 128, 136 (2d Cir. 2003); *Rohman*, 215 F.3d at 215–16). Here, before the charges were dismissed, Plaintiff had to go to court "more than one time." Pl.'s 50H Tr. at 4.

Accordingly, summary judgment is denied as to Plaintiff's malicious prosecution claims against both individual Defendants.

## III.   Abuse of Process

In *Cook v. Sheldon*, 41 F.3d 73, 80 (2d Cir. 1994), the Second Circuit recognized that a § 1983 Plaintiff may bring claims for abuse of process and turned to state law for its elements. "In New York, a malicious abuse of process claim lies against a defendant who (1) employs regularly issued legal process to compel performance or forbearance of some act (2) with intent to do harm without excuse or justification, and (3) in order to obtain a collateral objective that is outside the legitimate ends of the process." *Id.* (collecting cases). Defendants argue that

34

Plaintiff cannot meet the third element, which many courts have characterized as the "crux" of an abuse of process claim. *See, e.g.*, *Taylor v. City of New York*, No. 19 Civ. 6754 (KPF), 2022 WL 744037, at \*20 (S.D.N.Y. Mar. 11, 2022); *Douglas*, 595 F. Supp. 2d at 343–44.

As a preliminary matter, the Second Circuit has found that an arraignment is a clear employment of the criminal process in the context of an abuse of process claim. *See Cook*, 41 F.3d 73, 80 (2d Cir. 1994) (citing *Mormon v. Baran*, 35 N.Y.S.2d 906, 909 (Sup. Ct. 1942) (explaining that legal process means that a court issued the process, and the plaintiff will be penalized if he violates it)); *see also Nunez v. Vill. of Rockville Ctr.*, No. 18 Civ. 4249 (DRH) (SIL), 2022 WL 523753, at \*12 (E.D.N.Y. Feb. 22, 2022) (explaining that bringing defendant to arraignment satisfies first element). "Indeed, numerous courts have found the issuance-of-legal-process element met by an officer's arrest of . . . a plaintiff, so long as the issuance was 'for a collateral objective outside the legitimate ends of process.'" *Crockett v. City of New York*, No. 11-CV-4378 PKC, 2015 WL 5719737, at \*10 (E.D.N.Y. Sept. 29, 2015) (quoting *Mangino v. Inc. Vill. of Patchogue*, 739 F. Supp. 2d 205, 231–32 (E.D.N.Y. 2010), *on reconsideration in part*, 814 F. Supp. 2d 242 (E.D.N.Y. 2011)).

Next, because there is a disputed factual question critical to determining whether there was probable cause for Plaintiff's arrest, there is an issue of material of fact related to whether the second element of abuse of process is met here. That is because "[a] lack of probable cause 'gives rise to an inference of malice, supporting a finding of intent to harm.'" *Nunez v. Vill. of Rockville Ctr.*, No. 18-CV-4249 (DRH)

(SIL), 2022 WL 523753, at *12 (E.D.N.Y. Feb. 22, 2022) (quoting *Smith v. County of Nassau*, No. 10-CV-4874 (MKB), 2015 WL 1507767, at *17 (E.D.N.Y. Mar. 31, 2015)).

Finally, to meet the third element, "a plaintiff must prove not that [a] defendant acted with an improper motive, but rather an improper purpose — that is, 'he must claim that [a defendant] aimed to achieve a collateral purpose beyond or in addition to his criminal prosecution." *Taylor*, 2022 WL 744037, at *20 (quoting *Douglas,* 595 F. Supp. 2d at 344 (emphasis omitted)). "[A] malicious motive alone . . . does not give rise to a cause of action for abuse of process." *Vasicka v. Kerwin*, No. 18-CV-6858 (RPK) (SJB), 2022 WL 4641585, at *10 (E.D.N.Y. Sept. 30, 2022) (quoting *Savino v. City of New York*, 331 F.3d 63, 77 (2d Cir. 2003)). Examples of collateral purposes for abuse of process claims include procuring a search warrant to steal someone's property, issuing a criminal process to avoid personal liability, and fabricating an assault charge to save one's employment. *See, e.g.*, *VanZandt v. Fish & Wildlife Serv.*, 524 F. Supp. 2d 239, 246–47 (W.D.N.Y. 2007) (finding collateral purpose where defendant officer "abused the warrant process in order to steal valuable property from Plaintiffs"); *Gabilly v. City of New York,* No. 19-CV-11884 (RA), 2021 WL 3667981, at *4 (S.D.N.Y. Aug. 17, 2021) ("agree[ing] with Plaintiff that covering up an unconstitutional use of force, perhaps to forestall personal liability, could qualify as an illegitimate collateral objective for the issuance of criminal process"); *Hernandez v. Wells*, No. 01 Civ. 4376MBM, 2003 WL 22771982, at *9 (S.D.N.Y. Nov. 24, 2003) (finding that fabricating assault

charges to protect one's job constituted a collateral purpose for an abuse of process claim); *Douglas,* 595 F. Supp. 2d at 344 ("Fabricating assault charges to save one's job could be abuse of process, however, because 'safeguarding one's own employment lies outside the legitimate goal of criminal process.'" (quoting *Hernandez*, 2003 WL 22771982, at *9)); *see also Crockett*, 2015 WL 5719737, at *11–12 (collecting cases).

Here, Plaintiff argues that Defendants fabricated the assault, resisting arrest, and harassment charges to "shield themselves from liability from the wrongful actions committed against Plaintiff." Pl.'s Opp. at 25 (quoting Compl. ¶¶ 81–82). Taking the facts in the light most favorable to Plaintiff, a jury could find that the officers initiated the criminal process to avoid personal liability and/or to avoid adverse consequences (whether from internal discipline or job loss) in their employment as police officers. The Court therefore denies summary judgment on this claim.

## IV.  Due Process

### A. Substantive Due Process

It is "well established that, '[w]here another provision of the Constitution provides an explicit textual source of constitutional protection, a court must assess a plaintiff's claims under that explicit provision and not the more generalized notion of substantive due process.'" *Hu v. City of New York*, 927 F.3d 81, 104 (2d Cir. 2019) (quoting *Southerland v. City of New York*, 680 F.3d 127, 142–43 (2d Cir. 2012)).

The Court finds that Plaintiff's substantive due process claims related to his alleged false arrest, malicious prosecution, and excessive force merge with his

Fourth Amendment claims and are thus barred. These claims arise from the same conduct by the officers that he alleges violated his Fourth Amendment rights. *See, e.g.*, *Crockett*, 2015 WL 5719737, at *12 n.22 (finding that plaintiff's "substantive due process claims for excessive force, false arrest, and malicious prosecution merge with his Fourth Amendment claim because the former claim arises from the same conduct that allegedly violated his Fourth Amendment rights"); *see also Lonegan v. Hasty,* 436 F. Supp. 2d 419, 440 (E.D.N.Y. 2006) (dismissing substantive due process claims that arose from defendants' same conduct and sought a remedy for the same harms as plaintiffs' Fourth Amendment claims).

Plaintiff also argues that he may proceed with a substantive due process claim because Defendant officers "failed to immediately take Mr. Besedin to a hospital for prompt medical treatment." Pl.'s Opp. at 31 (citing *Estelle v. Gamble*, 429 U.S. 97, 104 (1976)). However, as Plaintiff's own citation makes clear, that alleged violation of Plaintiff's rights mirrors an established § 1983 claim rooted in a specific constitutional provision. In *Estelle v. Gamble*, the Supreme Court held that "deliberate indifference to serious medical needs of prisoners constitutes the unnecessary and wanton infliction of pain, proscribed by the Eighth Amendment." 429 U.S. at 104. Here, Plaintiff's deliberate indifference claim is "based on the Fourteenth Amendment because his claim arises in the context of pretrial arrest and detainment." *Nielsen v. Rabin*, 746 F.3d 58, 63 (2d Cir. 2014).

Plaintiff has not actually brought a deliberate indifference claim in this action: it was not in his Complaint, nor in any references to his claims in previous

38

filings to the Court.  *See, e.g.*, Pl.'s Resp. Opp. Defs.' Mot. Pre Mot. Conference, ECF No. 100 (mentioning no medical indifference under the Fourteenth Amendment and asserting that "[s]ubstantive due process violations have included: seven hours of detention and accompanying humiliation, ridicule and mental anguish"); Pl.'s Letter Dismissing Claims (mentioning no indifference to medical needs under the Fourteenth Amendment and arguing that "Plaintiff's due process claims are preserved by Defendants' blatantly unlawful motivations for arresting and detaining him").  And because Plaintiff has not pled or otherwise suggested that he sought to proceed to trial with a deliberate indifference claim under the Fourteenth Amendment, it would be improper to add that claim now.  *See, e.g.*, *Wolk v. Kodak Imaging Network, Inc.*, 840 F. Supp. 2d 724, 738 (S.D.N.Y. 2012), *aff'd sub nom. Wolk v. Photobucket.com, Inc.*, 569 F. App'x 51 (2d Cir. 2014) ("Even under the more liberal Rule 15(a) standard, it is improper to amend a complaint and add a new claim in response to a motion for summary judgment when discovery is complete."); *AEP Energy Servs. Gas Holding Co. v. Bank of Am., N.A.*, 626 F.3d 699, 726–27 (2d Cir. 2010) (holding that leave to amend should be denied where motion to amend was filed after defendant had filed summary judgment papers based on existing claims).

Accordingly, because all of Plaintiff's substantive due process arguments are claims arising from specific constitutional provisions which he either pled elsewhere in his complaint or failed to previously raise, the Court grants summary judgment on Plaintiff's substantive due process claim.

### B. Procedural Due Process

"A procedural due process claim is composed of two elements: (1) the existence of a property or liberty interest that was deprived and (2) deprivation of that interest without due process." *Radwan v. Manuel*, 55 F.4th 101, 123 (2d Cir. 2022) (quoting *Bryant v. N.Y. State Educ. Dep't*, 692 F.3d 202, 218 (2d Cir. 2012)). "When reviewing alleged procedural due process violations, the Supreme Court has distinguished between (a) claims based on established state procedures and (b) claims based on random, unauthorized acts by state employees." *Flynn v. Bloomingdale*, No. 22-1431, 2023 WL 4832223, at *3 (2d Cir. July 28, 2023) (summary order) (citing *Hellenic Am. Neighborhood Action Comm. v. City of New York*, 101 F.3d 877, 880 (2d Cir. 1996)). It is not clear whether Plaintiff is arguing that his procedural due process claim is based on the established state procedures or random unauthorized acts. Instead, he repeats his arguments related to his abuse of process claim, which the Court has already discussed above. *See* Pl.'s Opp. at 29–30. Moreover, his "due process claim cannot be predicated upon the same factual basis as plaintiffs' Fourth Amendment malicious abuse of process claim." *Mangino*, 739 F. Supp. 2d at 250 (E.D.N.Y. 2010) (collecting cases). Given the absence of any other argument related to his procedural due process claim, the Court grants summary judgment as to Plaintiff's procedural due process claim.

### V.    Negligence

"[U]nder New York State law, when a plaintiff brings excessive force and assault claims which are premised upon a defendant's allegedly intentional conduct,

a negligence claim with respect to the same conduct will not lie." *Hayden v. City of New York*, No. 17-CV-1894 (RJS), 2019 WL 11272910, at *6 (S.D.N.Y. Mar. 31, 2019) (quoting *Bogart v. City of New York*, No. 13-cv-1017 (NRB), 2016 WL 4939075, at *13 (S.D.N.Y. Sept. 6, 2016)); *see also Thorpe*, 2021 WL 3811238, at *13 ("It is well established that a plaintiff may not recover under general negligence principles for a claim that law enforcement officers failed to exercise the appropriate degree of care in effecting an arrest or initiating a prosecution." (quotation omitted)).  Here, Plaintiff's claims are clearly based on what he claims was intentional conduct on the parts of both individual Defendants.  Accordingly, his negligence claims are impermissibly based on the same conduct underlying his excessive force and intentional tort claims, and so must be dismissed.  Furthermore, to the extent Plaintiff is also basing his negligence claims on a theory that Defendants did not exercise an appropriate degree of care in initiating a prosecution, that theory also fails.  *See, e.g., Clark*, 2015 WL 5719612, at *11 ("Under New York law, a plaintiff may not recover under general negligence principles for a claim that law enforcement officers failed to exercise the appropriate degree of care in effecting an arrest or initiating a prosecution." (quoting *Bernard*, 25 F.3d at 102)); *Burbar v. Inc. Vill. of Garden City*, 961 F. Supp. 2d 462, 474 (E.D.N.Y. 2013) (finding under New York law that plaintiff's negligence claim was barred in a false arrest and malicious prosecution case).

## VI.    Municipal Liability Under *Monell*

"[C]onstitutional torts committed by city employees without official sanction or authority do not typically implicate the municipality in the deprivation of constitutional rights, and therefore the employer-employee relationship is in itself insufficient to establish the necessary causation." *Amnesty Am. v. Town of W. Hartford*, 361 F.3d 113, 125 (2d Cir. 2004); *see also Presti v. City of New York*, No. 21-CV-3811 (PKC) (SJB), 2024 WL 3360404, at *10 (E.D.N.Y. July 10, 2024) ("Because liability cannot be based simply on a theory of *respondeat superior*, a local government may not be sued under Section 1983 for an injury inflicted solely by its employees or agent." (alterations and quotations omitted)).  However, under *Monell v. Department of Social Services of New York*, 436 U.S. 658, 690–91, 694 (1978), a municipality — like the County here — may be liable under § 1983 if its "policy or custom" caused a deprivation of constitutional rights.  *See also Jones v. Town of E. Haven*, 691 F.3d 72, 80 (2d Cir. 2012) ("[A] municipality can be held liable under Section 1983 if the deprivation of the plaintiff's rights under federal law is caused by a governmental custom, policy, or usage of the municipality.").  In other words, "[a] municipality may be liable under [§] 1983 only if the governmental body itself subjects a person to a deprivation of rights or causes a person to be subjected to such deprivation." *Cash v. County of Erie*, 654 F.3d 324, 333 (2d Cir. 2011).

Accordingly, "[t]o hold a [municipality] liable under § 1983 for the unconstitutional actions of its employees, a plaintiff is required to plead and prove three elements: (1) an official policy or custom that (2) causes the plaintiff to be

subjected to (3) a denial of a constitutional right." *Lucente v. County of Suffolk*, 980 F.3d 284, 297 (2d Cir. 2020) (quoting *Wray v. City of New York*, 490 F.3d 189, 195 (2d Cir. 2007)).

One way to establish municipal liability is by showing a "'deliberate indifference' to a recurring situation likely to result in a constitutional violation." *Buari v. City of New York*, 530 F. Supp. 3d 356, 399 (S.D.N.Y. 2021). "In such circumstances, the policy or custom requirement is satisfied 'where a local government is faced with a pattern of misconduct and does nothing, compelling the conclusion that the local government has acquiesced in or tacitly authorized its subordinates' unlawful actions.'" *Id.* (quoting *Reynolds v. Giuliani*, 506 F.3d 183, 192 (2d Cir. 2007)). Thus, Plaintiff may satisfy the "policy, custom or practice" requirement by demonstrating "a failure by policymakers to provide adequate training or supervision to subordinates to such an extent that it amounts to deliberate indifference to the rights of those who come into contact with the municipal employees." *Brandon v. City of New York*, 705 F. Supp. 2d 261, 276–77 (S.D.N.Y. 2010) (first citing *Bd. of County Comm'rs v. Brown*, 520 U.S. 397, 407 (1997); then citing *City of Canton v. Harris*, 489 U.S. 378, 388 (1989)); *see also Buari*, 530 F. Supp. 3d at 399 ("Liability for deliberate indifference can be based upon a failure to train or a failure to supervise or discipline." (citing *Amnesty Am.*, 361 F.3d at 127)).

Although it is difficult to parse through Plaintiff's boilerplate assertions, Plaintiff seems to offer two theories of *Monell* liability: that the County was

deliberately indifferent to its subordinates' actions via inadequate training, and that the County failed to adequately supervise or discipline its officers.  Pl.'s Opp. at 36.[9]  The Court notes that most of Plaintiff's support in his opposition brief comes from his pleadings, but Plaintiff may not rely on allegations in his Complaint to support his *Monell* claim at this late stage.  *See, e.g.*, *Barker v. Rokosz*, No. 19-CV-514 (KAM) (JRC), 2024 WL 3322087, at *12 (E.D.N.Y. July 8, 2024) (explaining that plaintiff may not rely on allegations in his amended complaint at the summary judgment stage); *Makhnevich v. Bougopoulos*, 650 F. Supp. 3d 8, 21 (E.D.N.Y. 2023) (same); *Thorpe*, 2021 WL 3811238, at *13 ("[T]o the extent Plaintiff seeks to hold the City liable on a failure to train or supervise claim, that effort ends here, because he took no *Monell* discovery and has adduced absolutely no evidence of any failure to train [defendant officers].").

---

[9] Plaintiff does not claim — nor does the record support — that Beckwith and Mantovani were policymaking municipal employees, which could lead to direct liability under *Monell*.  *See, e.g.*, *Amnesty Am.*, 361 F.3d at 126 ("[A] single action by a decisionmaker who possesses final authority to establish municipal policy with respect to the action ordered is sufficient to implicate the municipality in the constitutional deprivation for the purposes of § 1983." (citation and quotation omitted)).  To the extent Plaintiff is implying that the sergeant present at the scene was a policymaker by his stray reference that "[a] county police commissioner is generally considered a policymaking official," Pl.'s Opp. at 36, he has failed to allege or point to any evidence suggesting that the sergeants are policymakers here.  *See, e.g.*, *Anthony v. City of New York*, 339 F.3d 129, 139 (2d Cir. 2003) (police sergeant is not responsible for creating official policy, even if he controls particular situation involved in complaint); *Raphael v. County of Nassau*, 387 F. Supp. 2d 127, 132 (E.D.N.Y. 2005) (police sergeant is not a municipal policymaker); *Allan v. City of New York*, 386 F. Supp. 2d 542, 546 (S.D.N.Y. 2005) (police captain is not municipal policymaker).

44

To support a theory under *Monell* and its progeny that the officers' purported constitutional violations were a result of the County's failure to train its officers, Plaintiff must establish "that the officials' purported failure to train occurred under circumstances that could constitute deliberate indifference," and must also "identify a specific deficiency in the city's training program[,] and establish that that deficiency is 'closely related to the ultimate injury,' such that it 'actually caused' the constitutional deprivation." *Amnesty Am.*, 361 F.3d at 129 (quoting *City of Canton*, 489 U.S. at 391). "[A] pattern of similar constitutional violations by untrained employees is 'ordinarily necessary' to demonstrate deliberate indifference for purposes of failure to train." *Thorpe*, 2021 WL 3811238, at *13 (quoting *Connick v. Thompson*, 563 U.S. 51, 62 (2011)).

"Under the failure to supervise or discipline theory, a plaintiff must show that the municipality failed to adequately supervise or discipline its employees (thereby implicitly encouraging or ratifying their unlawful conduct) and that such a failure of supervision or discipline was tantamount to deliberate indifference." *Buari*, 530 F. Supp. 3d at 400 (alterations and quotation omitted); *see also Savarese v. City of New York*, 547 F. Supp. 3d 305, 354 (S.D.N.Y. 2021) ("Inaction can rise to the level of a municipal policy 'where a local government is faced with a pattern of misconduct and does nothing, compelling the conclusion that the local government has acquiesced in or tacitly authorized its subordinates' unlawful actions.'" (quoting *Reynolds*, 506 F.3d at 192)). "Deliberate indifference is shown when 'the need for more or better supervision to protect against constitutional violations was obvious.'"

*Buari*, 530 F. Supp. 3d at 400 (quoting *Vann v. City of New York*, 72 F.3d 1040, 1049 (2d Cir. 1995)). "An obvious need may be demonstrated through proof of repeated complaints of civil rights violations; deliberate indifference may be inferred if the complaints are followed by no meaningful attempt on the part of the municipality to investigate or to forestall further incidents." *Id.* (quoting *Vann*, 72 F.3d at 1049. In addition, a municipality's deliberate indifference can be inferred "if the municipality's response is so patently inadequate to the task as to amount to deliberate indifference." *Newkirk v. County of Suffolk*, No. 17-CV-2960 (MKB), 2022 WL 824137, at *8 (E.D.N.Y. Mar. 18, 2022) (quoting *Vann,* 72 F.3d 1040 at 1049).

Here, Plaintiff does not offer any evidence or arguments related to any specific training or supervision that was (or was not) provided by the County during the relevant time period. And he has not even attempted to "establish that [any such] deficiency is closely related to the ultimate injury, such that it actually caused the constitutional deprivation." *Amnesty Am.*, 361 F.3d at 129 (quotation omitted). In addition, the only evidence that Plaintiff has offered to support his failure to discipline theory is the transcript of the Internal Affairs investigation in this case. However, without more, "the instant action cannot provide prior notice of a history of unconstitutional violations." *Miehle-Kellogg v. Doe*, No. 19-CV-4943(GRB)(JMW), 2023 WL 2632452, at *10 n.13 (E.D.N.Y. Mar. 24, 2023) (citing *Fiacco v. City of Rensselaer*, 783 F.2d 319, 328 (2d Cir. 1986) ("[T]he existence of a policy of nonsupervision amounting to deliberate indifference to constitutional rights cannot

be established by inference solely from evidence of the occurrence of the incident in question.")).

Accordingly, the Court grants summary judgment on Plaintiff's *Monell* claims. *See, e.g.*, *Manigault v. City of New York*, No. 11 Civ. 4307 (AJN), 2012 WL 13049173, at *10 (S.D.N.Y. Apr. 19, 2012) (granting summary judgment where claims were not supported by "evidence of a municipality's investigatory practices" and plaintiff had not "identified a specific inadequacy in the training programs"); *Hardy v. Adebanjo*, No. 10CV974 (JBA), 2012 WL 1107993, at *6 (D. Conn. Mar. 30, 2012) (granting summary judgment where plaintiff had "not identified any policy or training deficiency on the part of the [municipality] to show that their alleged deliberate indifference 'actually caused' the alleged constitutional deprivation").

## CONCLUSION

For the foregoing reasons, the Court denies Defendants' motion for summary judgment as to Plaintiff's § 1983 false arrest, malicious prosecution, and abuse of process claims as well as Plaintiff's false arrest claim and abuse of process claims under state law. These claims will proceed to trial, along with Plaintiff's § 1983 claim for excessive force and his state law claim for assault and battery. The Court grants summary judgment as to Plaintiff's due process, negligence, and *Monell* claims.

SO ORDERED.                                          */s/ Nina R. Morrison*

                                                   NINA R. MORRISON
                                                   United States District Judge

Dated: Brooklyn, New York
       September 18, 2024