**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**
-------------------------------------------------------------- X
**ROBERT BESEDIN, SR.,**

                      **Plaintiff,**

         -against-

**COUNTY OF NASSAU,** *et al.*,

                    **Defendants.**
--------------------------------------------------------------X

**CV-18-819 (NRM) (ST)**


# PLAINTIFF'S MEMORANDUM OF LAW
# IN OPPOSITION TO DEFENDANTS'
# MOTIONS FOR JUDGMENT AS A MATTER OF LAW,
# A NEW TRIAL OR REMITTITUR, PURSUANT TO
# FEDERAL RULE 50 AND 59


                            **LAW OFFICES OF**
                            **FREDERICK K. BREWINGTON**
                            **556 Peninsula Boulevard**
                            **Hempstead, New York 11550**
                            **(516) 489-6959**


**OF COUNSEL:** *FREDERICK K. BREWINGTON,ESQ., SCOTT A. KORENBAUM, ESQ.*

## TABLE OF CONTENTS

PAGE NO.

TABLE OF AUTHORITIES. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . iii

PRELIMINARY STATEMENT.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

STATEMENT OF FACTS.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

ARGUMENT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

POINT 1

    THE COURT PROPERLY EXERCISED ITS DISCRETION IN ALLOWING DR. BERRILL TO TESTIFY THAT HE SUFFERED A CAUSALLY RELATED TRAUMATIC BRAIN INJURY ON FEBRUARY 7, 2017, AND TO LIMIT THE DEFENDANTS' USE OF THE 911 CALLS TO IMPEACH MR. BESEDIN'S CREDIBILITY.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

    A.    The Court acted appropriately I permitting Dr. Berrill to opine that Mr. Besedin suffered a causally related TBI on February 7, 2017.. . 3

    B.    The court did not hamper the defendants' ability to use effectively Mr. Besedin's 911 calls in any manner, never mind in a manner that prejudiced them.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

POINT II

    AMPLE EVIDENCE SUPPORTED THE JURY'S VERDICT, A NUMBER OF THE DEFENDANTS' ARGUMENTS ARE UNPRESERVED, AND THE DEFENDANTS PROVIDE NO REASON FOR THE COURT TO ORDER A NEW TRIAL. . . . . . . . . . . . . . 8

    A.    The standards governing defendants' motions.. . . . . . . . . . . . . . . . 9

    B.    The relevant legal principles governing Mr. Besedin's malicious prosecution claim. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

    C.    Ample evidence existed to establish that Mantovani initiated or continued the criminal prosecution. . . . . . . . . . . . . . . . . . . . . . . . . 12

D.    Defendants did not preserve their arguments regarding a lack of probable cause, a lack of malie or qualified immunity because they never articulated any facts in their Rule 50()a) motoin to support these arguments.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

E.    Ample evidence existed to support the jury's findings of liability regarding Mr. Besedin's malicious prosecution claim.. . . . . . . . . . 14

F.    Ample evidence existed to support the jury's findings of liability regarding Mr. Besedin's malicious abuse of process claim.. . . . . . 18

G.    The jury's verdict is neither seriously erroneous, nor a miscarriage of justice.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

POINT III

THE JURY'S AWARD OF PUNITIVE DAMAGES REFLECTS ITS RECOGNITION THAT MANTOVANI RUTHLESSLY ATTACKED MR. BESEDIN AND THEN BOTH DEFENDANTS ATTEMPTED TO COVER THEIR TRACKS BY FRAMING MR. BESEDIN FOR CRIMES HE DID NOT COMMIT.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

A.    The standards governing remittitur.. . . . . . . . . . . . . . . . . . . . . . . 21
      1    Reprehensibility.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22
      2.    The ratio of punitive damages to compensatory damages. . . 23
      3.    Comparable civil or criminal penalties. . . . . . . . . . . . . . . . 24
      4.    Relevant case law. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

POINT IV

AMPLE EVIDENCE EXISTED OF PHYSICAL INJURIES, LONG-TERM DETERIORATION OF MENTAL HEALTH AND LOSS OF LIBERTY TO SUSTAIN THE JURY'S COMPENSATORY DAMAGES AWARD.. . . . . . . . . . . . . . . . . . . . . . . . . 33

A.    The standards governing this Court's review of compensatory damages.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

B.    Remitttur of the compensatory damages award is unnecessary.. . . 34

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

## TABLE OF AUTHORITIES

Cases

*Adedeji v. Hoder*
    935 F. Supp. 2d 557 (E.D.N.Y. 2013). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*Alla v. Verkay*
    979 F. Supp. 2d 349 (E.D.N.Y. 2013). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23, 30, 37

*Amorgianos v. Amtrak*
    303 F.3d 256 (2d Cir. 2002). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

*Askins v. Doe*
    727 F.3d 248 (2d Cir. 2013). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*Besedin v. County of Nassau*
    18-cv-819, 2024 U.S. Dist. LEXIS 168488
    (E.D.N.Y. Sept. 18, 2024). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18, 19

*Bermudez v. City of New York*
    790 F.3d 368 (2d Cir. 2015). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*Bogle v. McClure*
    332 F.3d 1347 (11th Cir. 2003). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25, 31-33

*BMW of North America, Inc. v. Gore*
    517 U.S. 559 (1996). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22, 27

*Bridgeview Health Care Ctr. v. Clark*
    09 C 5601, 2012 U.S. Dist. LEXIS 184089
    (E.D. Ill. Sep. 28, 2012). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

*Cameron v. City of New York*
    598 F.3d 50 (2d Cir. 2010). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10, 16

*Chiaverini v. City of Napoleon*
    602 U.S. 556 (2024). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*Coggins v. Buonora*
    776 F.3d 108 (2d Cir. 2015). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*Coggins v. County of Nassau*
    988 F. Supp. 2d 231 (E.D.N.Y. 2013), *aff'd sub nom.*,
    *Coggins v. Buonora*, 776 F.3d 108 (2d Cir. 2015). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*Cook v. Sheldon*
  41 F.3d 73 (2d Cir. 1994). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15, 18, 19

*Dancy v. McGinley*
  843 F.3d 93 (2d Cir. 2016). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33-34

*DiSorbo v. Hoy*
  343 F.3d 172 (2d Cir. 2003). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22, 23

*DLC Mgmt. Corp. v. Town of Hyde Park*
  163 F.3d 124 (2d Cir. 1998). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19-20

*Drayton v. City of New York*
  17-cv-7091, 2022 U.S. Dist. LEXIS 207165
  (E.D.N.Y. Dec. 2, 2022). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*Edrei v. Maguire*
  892 F.3d 525 (2d Cir. 2018). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*Emamian v. Rockefeller Univ.*
  2018 U.S. Dist. LEXIS 97674
  (S.D.N.Y. June 8, 2018) *aff'd*,
  823 Fed. Appx. 40 (2d Cir. 2020) (summary order). . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

*Fresh v. Entm't U.S.A., Inc.*
  340 F. Supp. 2d 851 (W.D.Tenn. 2003). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25-26, 30

*Gagnon v. Ball*
  696 F.2d 17 (2d Cir. 1982). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

*Galdieri-Ambrosini v. Nat'l Realty & Development Corp.*
  136 F.3d 276 (2d Cir. 1998). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10, 14

*Gardner v. Federated Dep't Stores, Inc.*
  907 F.2d 1348 (2d Cir. 1990). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

*Garnett v. Undercover Officer C0039*
  838 F.3d 265 (2d Cir. 2016). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

*Gilead Cmty. Servs. v. Town of Cromwell*
  12 F.4th 93 (2d Cir. 2024). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31-32, 33

*Greenaway v. County of Nassau*
    327 F.Supp.3d 552  (E.D.N.Y. 2018)........................................ 14, 19

*Hope v. Pelzer*
    536 U.S. 730 (2002)...................................................... 16

*Jennings v. Yurkiw*
    18 F.4th 383 (2d Cir. 2023). ............................................ 21-20, 34

*Kee v. City of New York*
    12 F.4th 150 (2d Cir. 2021)............................................. 12, 14-15

*Kennedy v City of New York*
    2019 NYLJ LEXIS 4530
    (Sup. Ct. N.Y. County Dec, 12, 2019). ................................... 37

*King v. New York City Bd. of Educ.,*
    96-CV-2730, 2000 U.S. Dist. LEXIS 18709
    (E.D.N.Y. Dec. 19, 2000)................................................. 3

*Lee v. Edwards*
    101 F.3d 85 (2d Cir. 1996).............................................. 21-27

*Lore v. City of Syracuse*
    670 F.3d 127 (2d Cir. 2012)............................................. 11, 14

*Martinez v. City of New York*
    16 CV 79, 2023 U.S. Dist. LEXIS 124643
    (E.D.N.Y. Jul. 19, 2023)................................................ 29, 31

*McCardle v. Haddad*
    131 F.3d 43 (2d Cir. 1997).............................................. 9-10

*McDevitt v. County of Suffolk*
    16-cv-4164, 2024 U.S. Dist. LEXIS 53860
    (E.D.N.Y. Mar. 26, 2024)................................................ 34-35

*Morse v. Fusto*
    804 F.3d 538 (2d Cir. 2015)............................................. 16

*Mullenix v. Luna*
    577 U.S. 7 (2015)....................................................... 16

*Payne v. Jones*
   711 F.3d 85 (2d Cir. 2013). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21, 27, 33

*Pearl v. City of Long Beach*
   296 F.3d 76 (2d Cir. 2002). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

*Perry v. Ethan Allen, Inc.*
   115 F.3d 143 (2d Cir. 1997). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

*Piesco v. Koch*
   12 F.3d 332 (2d Cir. 1993). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

*Raedle v. Credit Agricole Indosuez*
   670 F.3d 411 (2d Cir. 2012). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*Rangolan v. County of Nassau*
   370 F.3d 239 (2d Cir. 2004). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

*Ravina v. Columbia Univ.*
   16-CV-2137, 2019 U.S. Dist. LEXIS 56556
   (S.D.N.Y. March 31, 2019). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

*Reeves v. Sanderson Plumbing Prods., Inc.*
   530 U.S. 133 (2000). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

*Ricciuti v. New York City Trans. Auth.*
   124 F.3d 130-31 (2d Cir. 1997). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*Robertson v. Sullivan*
   07-cv-1416, 2010 U.S. Dist. LEXIS 46691
   (E.D.N.Y. May 12, 2010). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*Singer v. Fulton Co. Sheriff*
   63 F.3d 110 (2d Cir. 1995). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

*Smith v. Wade*
   461 U.S. 30 (1983). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

*Toporoff Engineers, P.C. v. Fireman's Fund Ins. Co.*
   371 F.3d 105 (2d Cir. 2004). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

*Tretola v. County of Nassau*
   14 F. Supp.3d 58 (E.D.N.Y. 2014). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*United Realty Advisors, LP v. Verschleiser*
   2022 U.S. Dist. LEXIS 189259
   (S.D.N.Y. Oct. 17, 2022). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

*Zellner v. Summerlin*
   494 F.3d 344 (2d Cir. 2007). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16-17

Statutes and Other Sources

18 U.S.C. § 242. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

18 U.S.C. §§ 1621, 1623. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

18 U.S.C. § 3571(b)(3). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27-28

Fed. R. Civ. Proc. 50. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9, 10, 13, 14

Fed. R. Civ. Proc. 59. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3, 19

Fed. R. Civ. Proc. 61. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

Fed. R. Evid. 403. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

N.Y. Penal L. § 70.02. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

N.Y. Penal L. § 120.05. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

N.Y. Penal L. § 175.10. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

N.Y. Penal L. § 195.00. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

N.Y. Penal L. § 210.15. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

## PRELIMINARY STATEMENT

Following eight days of jury selection, trial testimony and deliberations, the jury returned a resounding victory in favor of plaintiff, Robert Besedin, Sr., and against defendants County of Nassau and Police Officers Stephen Beckwith and Dominick Mantovani.  The jury found that Mantovani used excessive force when he viciously hurled Besedin, an elderly veteran who posed no threat to the defendants, from his front porch onto the concrete walkway.  The jury further found that Beckwith and Mantovani lied to Assistant District Attorneys when they claimed that Mr. Besedin assaulted Mantovani by "violently flail[ing] his arms, kick[ing] and scream[ing], and push[ing] Officer Mantovani down four steps on the exterior of his home."  And the jury recognized that Beckwith and Mantovani lied on the witness stand even when confronted with video evidence that Mr. Besedin had committed none of the acts they attributed to him.

Having listened carefully to the evidence of Mr. Besedin's injuries, the jury awarded $760,000 in compensatory damages.  And having seen and listened carefully to Beckwith's and Mantovani's conduct, including their efforts to frame Mr. Besedin for crimes he did not commit and then lying repeatedly at trial about the same, the jury awarded punitive damages in the amount of $800,000 against each defendant.

Mr. Besedin submits this memorandum of law in opposition to the defendants' motion for judgment as a matter of law, a new trial, or a reduction of the jury's award of compensatory and punitive damages.  Having presided over the trial, Mr. Besedin is confident the Court appreciates that ample evidence existed to support the jury's verdict.  In arguing to the contrary, defendants violate the cardinal principles governing this Court's review by viewing the evidence most favorably to them.  A number of their arguments are unpreserved.  In asking the Court to assess credibility in their motion for a new trial, they present no compelling reason to do so.  And their arguments for

a new trial based upon the Court's alleged evidentiary errors are wrong.

Defendants' arguments regarding the need to remit the jury's compensatory and punitive damages awards ignore Mr. Besedin's evidence and the depravity of their actions. Defendants' actions were violent (Mantovani body slammed a 72-year old man onto the concrete sidewalk without justification), callous (they denied him prompt medical assistance) and deceitful (they repeatedly lied about Besedin's actions to justify Mantovani's unconstitutional use of force).

## STATEMENT OF FACTS

Because the Court presided over the trial, Mr. Besedin presumes its familiarity with the proceedings. He references the relevant pages of the pre-trial and trial transcripts, which are annexed to the Declaration of Andrew Blancato ("Blanco Dec."), dated and filed November 27, 2024, at Exhs. A-G, to support his arguments, and the exhibits annexed to the Declaration of Frederick K. Brewington in Opposition to Defendants' Post-Trial Motions ("Brewington Dec."), dated December 27, 2024.

## ARGUMENT

## POINT I

## THE COURT PROPERLY EXERCISED ITS DISCRETION IN ALLOWING DR. BERRILL TO TESTIFY THAT HE SUFFERED A CAUSALLY RELATED TRAUMATIC BRAIN INJURY ON FEBRUARY 7, 2017, AND TO LIMIT THE DEFENDANTS' USE OF THE 911 CALLS TO IMPEACH MR. BESEDIN'S CREDIBILITY

Defendants seek a new trial on the grounds that the Court impermissibly permitted Dr. Berrill to opine that Mr. Besedin suffered a causally related traumatic brain injury ("TBI") on February 7, 2017. Defs. Memo at 3. They also contend that a new trial is warranted because the Court impermissibly limited its use of the 911 calls Mr. Besedin made on February 7th.

-2-

Rule 59 of the Federal Rules of Civil Procedure authorizes the grant of a new trial if a trial court's evidentiary errors represent substantial prejudice. *King v. New York City Bd. of Educ.*, 96-CV-2730, 2000 U.S. Dist. LEXIS 18709, *20 (E.D.N.Y. Dec. 19, 2000) (citing Fed. R. Civ. Proc. 61). To establish an entitlement to a new trial for evidentiary errors, the moving party shoulders a heavy burden. The movant must demonstrate that the evidentiary errors swayed the factfinder's judgment in some material respect, and that the absence of relief would be inconsistent with substantial justice. *Perry v. Ethan Allen, Inc.*, 115 F.3d 143, 150 (2d Cir. 1997). Defendants' contentions do not withstand scrutiny.

A.    **The Court acted appropriately in permitting Dr. Berrill to opine that Mr. Besedin suffered a causally related TBI on February 7, 2017.**

Defendants complain that "the Court permitted Plaintiff's expert, Dr. N.G. Berrill, PhD, to testify that Plaintiff sustained a causally related traumatic brain injury ("TBI") on February 7, 2017." Defs. Memo at 3. The sole argument they advance here is that Dr. Berrill failed to rule out other causes for his opinion that Mr. Besedin suffered a TBI that was causally-related to the injuries he sustained on February 7th, which they acknowledge was the crux of their motion *in limine*. They do not raise any challenges to the tests he performed or the validity of their results. Nor do they raise any challenge to Dr. Berrill's credentials or expertise. And they do not challenge Dr. Berrill's conclusion that Mr. Besedin suffered from post-traumatic stress disorder ("PTSD"). (Defs. Memo at 4-7.) A review of their arguments reflect a rehashing of many of the same arguments in their pretrial motion *in limine*, and Mr. Besedin refers the Court to its prior ruling denying the defendants' motion for the myriad reasons why the Court's ruling remains correct. *See* Blancato Dec. at Exh. A, pp. 3-13. Mr. Besedin addresses here some of the additional flaws in the defendants' arguments.

The chief flaw in defendants' arguments rest with its failure to appreciate Dr. Berrill's opinion. Dr. Berrill testified that Mr. Besedin suffered a TBI on February 7, 2017 (Tr. 628), and that the injury he experienced on February 7, 2017, "played a role in his decline." (Tr. 633.) As he noted, the TBI he suffered on February 7th, "add[ed] to the problems he was demonstrating in my office and caused him difficulties, probably hastened or assisted in hastening one of the variables, assisted in hastening his decline in functioning. I mean at the very least, it didn't do him any favors." (Tr. 634.) Defendants ignore that their own expert, Dr. Meyers, confirmed that a concussion, which was documented by the medical records, "is a form of traumatic brain injury." (Tr. 719.)

Defendants place great weight on the TBI Mr. Besedin suffered in 2003. They contend that Dr. Berrill "concluded, without explanation, that Plaintiff's symptoms [were] attributable to a 2017 head injury and not the severe TBI he sustained in 2003." Defs. Memo at 5. That was not Dr. Berrill's opinion, as noted. Defendants' argument also ignores that Dr. Berrill explained why he believed that the 2017 TBI was a factor in Mr. Besedin's decline. He testified that the information he received demonstrated that Mr. Besedin had recovered sufficiently from the 2003 TBI to permit him to return to the auto repair shop he owned, and that there was no evidence that he was ever placed on disability following his 2003 TBI. (Tr. 614.)

Defendants incorrectly contend that Dr. Berrill ignored the impact of Mr. Besedin's vascular issues and alcohol abuse. Defs. Memo at 6-7. Dr. Berrill "was aware that there was some cerebral vascular difficulties" (Tr. 663), which he considered in reaching his conclusion that Mr. Besedin "presents with a complicated background of symptoms and problems; and I believe I said earlier, certainly the events that took place in February of 2017 were just another factor and I think an important factor in hastening his, I guess not failure to thrive but his decompensating and experiencing enhanced difficulty psychologically, cognitively, and ultimately impacted his ability

-4-

to live independently and take care of himself." (Tr. 702.)

Defendants advance similar arguments regarding alcohol abuse. Mr. Besedin notes that the Court correctly rejected this argument – defendants acknowledge but disagree with the Court's conclusion. Defs. Memo at 6. As the Court noted, "[a]lthough Dr. Berrill appeared to concede at his deposition that he could not entirely rule out alcohol use as one potential source of some of the TBI symptoms he observed, Dr. Berrill's report did account for Plaintiff's alcohol use in its history and findings. The report also includes information received from Plaintiff's wife that his alcohol use had actually, quote, subsided, unquote, after the incident with Defendants. That's from page 16 of his report." Blancato Dec. at Exh. A, pp. 12-13. Finally, nothing about Dr. Berrill's trial testimony contradicted the Court's conclusion that he had considered Mr. Besedin's prior alcohol use in reaching his conclusion. While defendants' counsel asked a series of questions relating to alcohol's impact on brain functioning, Mr. Blancato did not ask any ultimate questions relating to its impact on Dr. Berrill's conclusions. (Tr. 661.) Thus, defendants' argument, as noted, ignores the substance of Dr. Berrill's opinion.

At bottom, the defendants' challenge to Dr. Berrill's testimony amounts to a disagreement with his opinions. But a trial court's job is not to assess whether it agrees or disagrees with the expert's opinions; it is to analyze the soundness of the principles and methodologies employed by an expert in reaching his or her conclusions. *Amorgianos v. Amtrak*, 303 F.3d 256, 266 (2d Cir. 2002) (citation omitted). Here, Dr. Berrill considered Mr. Besedin's medical history, including his prior TBI, vascular and alcohol related issues, recognized they had medical significance, and incorporated them into his opinion that the TBI Mr. Besedin suffered on February 7, 2017, negatively impacted his ability to function. The Court correctly recognized that such issues went to the weight of Dr. Berrill's testimony, and not to its admissibility.

-5-

**B.**    **The court did not hamper the defendants' ability to use effectively Mr. Besedin's 911 calls in any manner, never mind in a manner that prejudiced them**

Defendants take issue with the limitations the Court placed on their use at trial of the multiple 911 calls Mr. Besedin placed on February 7th. They do not take issue with the Court's determination that the 911 calls had no bearing on the issue of probable cause. Defs. Memo at 7-8. Instead, defendants contend the Court should have permitted them to use the 911 calls to demonstrate Mr. Besedin's demeanor and mental state, and to impeach Mr. Besedin's credibility with the calls. Defs. Memo at 8-9. Defendants' arguments fail for myriad reasons.

Defendants' arguments ignore the Court's actual rulings and the arguments they actually made. Defendants did not raise the argument advanced here, that the 911 calls were relevant to Mr. Besedin's demeanor and mental state. Instead, they contended that the 911 calls were relevant to establishing that Mr. Besedin had a pre-existing TBI. The Court rejected their argument that the 911 calls were relevant to Mr. Besedin's damages because, as it stated, "Defendants have not in any way articulated how the calls are relevant to Plaintiff's TBI diagnosis, nor how the calls could possibly aid the jury's assessment of whether he sustained a TBI later that evening during his arrest. For example, they do not point to any details of the calls that indicate the presence or absence of TBI symptoms." (Tr. 271.) Nor do the defendants explain, as the Court noted, "how a lay jury could possibly be expected to evaluate plaintiff's statements in these audio recordings to make that scientific assessment." (Tr. 272.) Having failed to present the argument they now advance, defendants have waived this objection. *See generally United Realty Advisors, LP v. Verschleiser*, 2022 U.S. Dist. LEXIS 189259, *5 (S.D.N.Y. Oct. 17, 2022) ("In the motion in limine, the defendants also raise a series of arguments that they waived by not raising them in a timely fashion.").

The Court agreed with defendants that the 911 calls were relevant to the issue of Mr. Besedin's intoxication or to impeach his credibility about the same. While it is unclear if the defendants complain about this, such argument is futile. Given the lengthy nature of the 911 calls, the Court invited defendants' counsel to make a proffer of which parts of the 911 calls they wanted to introduce, whether as substantive evidence or impeachment. (Tr. 272-74.) The next day, defendants' counsel identified two areas of the 911 calls she intended to use to impeach Mr. Besedin's credibility regarding intoxication, which the Court permitted. (Tr. 473-74.) Those portions of the 911 calls were presented to the jury. (Tr. 524-26.)

Defendants identify one instance during their cross-examination of Mr. Besedin in which the Court did not permit them to play a snippet of a 911 call. They do not articulate why this portion of Mr. Besedin's 911 call was relevant to an issue in the case or how it bore on his credibility notwithstanding their hyperbolic contention that "[t]he significance of this facially provocative call was high as was the importance of hearing Plaintiff's credibility impeached in such a profound manner." Defs. Memo at 9. And they never brought to the Court's attention their intent to use this 911 call. Having failed to do so, they cannot be heard now to object.

The Court exercised its discretion under Rule 403 of the Federal Rules of Evidence in precluding the defendants from playing the calls at length because "they contain an array of evidence that is irrelevant to the ultimate issues in this case[,]" and "there may be some risk of confusion or prejudice from asking a lay jury to conclude that plaintiff was intoxicated based on things like his tone of voice or speech patterns in the audio alone." (Tr. 273.) The Court's ruling did not leave the defendants defenseless. Defendants had ample opportunity to introduce evidence bearing on Mr. Besedin's mental state and state of intoxication: "To evaluate the parties' competing claims as to damages, defendants will be able to offer the jury testimony from the parties,

-7-

themselves; other lay witnesses who knew plaintiff well; plaintiff's medical records; and importantly, expert testimony from both parties' experts. All of this evidence will be available to the jury to evaluate plaintiff's complete medical history and symptoms prior to and after his encounter with defendants." (Tr. 272.)

Finally, defendants do not indicate how they were prejudiced by the Court's rulings other than to complain in conclusory terms. Defendants ignore that the jury saw firsthand how Mr. Besedin conducted himself on the porch of 2510 Harrison Avenue and how Mantovani responded. The videotape evidence (Plaintiff's Exh. 13-A) easily persuaded the jury that Mr. Besedin did not commit the crimes of Resisting Arrest or Assault in the Second Degree, that Mantovani used excessive force when he grabbed Mr. Besedin around the neck and hurled him from the porch onto the concrete walkway, and that Mantovani and Beckwith lied repeatedly to the District Attorney's Office and to the jury regarding Mr. Besedin's and their actions.

POINT II

**AMPLE EVIDENCE SUPPORTED THE JURY'S VERDICT, A NUMBER OF THE DEFENDANTS' ARGUMENTS ARE UNPRESERVED, AND THE DEFENDANTS PROVIDE NO REASON FOR THE COURT TO ORDER A NEW TRIAL**

Defendants claim they are entitled to judgment as a matter of law or a new trial. Regarding the malicious prosecution claim, Mantovani claims there was an absence of evidence that he was involved in the initiation of the criminal prosecution. Both defendants claim that the undisputed evidence established probable cause for each of the crimes with which they charged Mr. Besedin and an absence of malice. And both claim they are entitled to qualified immunity. Defs. Memo at 10-19. Regarding Mr. Besedin's malicious abuse of process claim, defendants contend the jury's verdict should be set aside because probable cause existed for Mr. Besedin's criminal prosecution and because Mr. Besedin "failed to demonstrate that Defendants sought to obtain a collateral

-8-

objective outside the legitimate ends of the process." Finally, both defendants assert they are entitled to qualified immunity. Defs. Memo at 20-24. Defendants' arguments are meritless.

**A. The standards governing defendants' motions**.

"In entertaining a motion for judgment as a matter of law, the court should review all of the evidence in the record." That review

> must draw all reasonable inferences in favor of the nonmoving party . . . Thus, although the court should review the record as a whole, it must disregard all evidence favorable to the moving party that the jury is not required to believe. . . . That is, the court should give credence to the evidence favoring the nonmovant as well as that evidence supporting the moving party that is uncontradicted and unimpeached, at least to the extent that evidence comes from disinterested witnesses.

*Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150-51 (2000) (citations and quotations omitted),

The Court cannot grant a motion for lack of sufficient evidence unless there is "such a complete absence of evidence supporting the verdict that the jury's findings could only have been the result of sheer surmise and conjecture, []or . . . the evidence in favor of defendants so overwhelming that reasonable and fair minded [persons] could not arrive at a verdict against [them]." *Toporoff Engineers, P.C. v. Fireman's Fund Ins. Co.*, 371 F.3d 105, 108 (2d Cir. 2004) (quotation marks and citations omitted). In reaching its verdict, the jury was free to select the evidence it chose to rely on. *See Lore v. City of Syracuse*, 670 F.3d 127, 150 (2d Cir. 2012).

Federal Rule of Civil Procedure 50(a)(2) provides, in relevant part, that "[a] motion for judgment as a matter of law may be made at any time before the case is submitted to the jury. The motion must specify the judgment sought and the law and facts that entitle the movant to the judgment." "[A] posttrial motion for JMOL can properly be made only if, and to the extent that, such a motion specifying the same grounds was made prior to the submission of the case to the

-9-

jury." *McCardle v. Haddad*, 131 F.3d 43, 51 (2d Cir. 1997) (quotations omitted).

The purpose behind Rule 50(a)'s specificity requirement is to provide the non-movant with the opportunity to cure any alleged defects in the sufficiency of proof. *Galdieri-Ambrosini v. Nat'l Realty & Development Corp.*, 136 F.3d 276, 286-87 (2d Cir. 1998). It is insufficient for a defendant merely to state (s)he is entitled to dismissal of the substantive claims or qualified immunity. The defendant must articulate facts in support of his/her Rule 50(a) motion so not to deprive the opposing party of the opportunity to cure any defects. *Id.* at 286 ("the JMOL motion must at least identify the specific element that the defendant contends is insufficiently supported."). *See Piesco v. Koch*, 12 F.3d 332, 341 (2d Cir. 1993) (conclusory statement that "defendants move for [JMOL]" was inadequate).

**B.    The relevant legal principles governing Mr. Besedin's malicious prosecution claim.**

The elements of a malicious prosecution claim are well-known. "Malicious prosecution occurs when (1) the defendant initiated a prosecution against plaintiff, (2) without probable cause to believe the proceeding can succeed, (3) the proceeding was begun with malice and, (4) the matter terminated in plaintiff's favor." *Cameron v. City of New York*, 598 F.3d 50, 63 (2d Cir. 2010). Mr. Besedin also had to establish that he suffered a post-arraignment deprivation of liberty. *Singer v. Fulton Co. Sheriff*, 63 F.3d 110, 116 (2d Cir. 1995). Defendants conceded that Mr. Besedin's criminal prosecution terminated in his favor and that he suffered a post-arraignment deprivation of liberty, and the Court so instructed the jury. (Tr. at 944-45.)

Regarding Mantovani's claim that he did not initiate the criminal prosecution, the Court instructed the jury, without objection from the defendants, as follows:

> First, the plaintiff must prove by a preponderance of the evidence that a defendant initiated or continued a criminal prosecution against the plaintiff, based on evidence separate and apart from the arrest itself.

-10-

> A defendant may be said to have initiated the criminal prosecution if the defendant engaged in one or more of the following acts: Directed, encouraged, advised or required a prosecutor to initiate or continue the plaintiff's prosecution; directly gave the prosecutor information that the defendant knew to be false, such as through the filing of a criminal complaint or otherwise; withheld information that a reasonable person would realize might affect the prosecutor's determination of whether to prosecute; or signed a criminal complaint.
>
> A defendant cannot be said to have initiated a criminal proceeding simply because he fairly and truthfully disclosed to the prosecutor all matters within his knowledge that a reasonable person would believe to be important to the question of the plaintiff's guilt or innocence. If, however, you find that one or more defendants gave the prosecutor information that that defendant knew to be false, that defendant is responsible for initiating the prosecution.

(Tr. 945-46.)

Regarding the defendants' claim that probable cause existed for each of the crimes they charged Mr. Besedin with, the Court instructed the jury, again without objection from the defendants, as follows:

> Probable cause to prosecute exists when the facts and circumstances within an officer's knowledge at the time he takes steps to proceed with a prosecution are sufficient for an officer of reasonable prudence to believe that the person being charged was guilty of the crimes charged. Even if the defendant personally believed that the plaintiff was guilty, that belief is not enough if a reasonably prudent person would not have believed that to be so. On the other hand, the fact that the criminal charge was ultimately dismissed does not prove that a defendant lacked probable cause at the time the prosecution was initiated.
>
> You are not to determine whether the plaintiff was, in fact, innocent or guilty of the offenses for which he was prosecuted. You are only to determine whether, based on the facts as they reasonably appeared to the defendants, a reasonably prudent officer would have believed that the plaintiff was guilty of each of the three crimes with which he was charged. If you find that the defendant lacked probable cause as to any one of the charged offenses, the plaintiff has met his burden of proof as to this element.

-11-

(Tr. 947.)   The instructions regarding probable cause accurately reflect the law, which requires a plaintiff to establish only that probable cause was lacking for any of the charged offenses. *See Kee v. City of New York*, 12 F.4th 150, 166 (2d Cir. 2021) (citations omitted).

**C.   Ample evidence existed to establish that Mantovani initiated or continued the criminal prosecution**

Mantovani contends that "[t]he record is bereft that [he] continued the prosecution against Plaintiff. There is no evidence, or even an allegation, that Defendant Mantovani lied to the NCDA or anyone else about this matter. While it is uncontested that Mantovani spoke with the NCDA 'two or three times' those discussions merely entailed the officers 'giving our statements and recollection of what happened that evening.'" Defs. Memo at 11.   Mantovani's argument ignores his own testimony at trial, which reveals that he lied to the DA's Office.

Mantovani went to the DA's Office two or three times; at least twice with Beckwith. He knew that Mr. Besedin was being charged with felony assault, among other things, and he answered questions posed by the DA's Office about those charges. (Tr. 301-03.)   As Mantovani testified in response to the question about going to the prosecutor's office to assist in the prosecution of the case, "I wouldn't say assist technically, I mean, we were there giving our statements and recollection of what happened that evening." (Tr. 302.)   Mantovani did more than just give his statements and recollection of what happened that evening.   He told the DA's Office that he "wanted to proceed with the felony," and that he wanted Mr. Besedin to be found guilty of the felony (Tr. 318), which the Court correctly noted allowed the jury to find he initiated the criminal prosecution. (Tr. 829-31.)

From this testimony the jury easily concluded that Mantovani initiated the criminal prosecution.   The jury had every reason to believe that Mantovani's "statements and recollection of what happened that evening" included his testimony underlying the felony assault prosecution.   But

-12-

Mantovani's testimony, as revealed by the surveillance video (Plaintiff's Exh. 13-A) and Mr. Besedin's testimony that he never hit either of the defendants or made any contact with them before being hurled down the stairs (Tr. 454-55), was false, which meant that he repeatedly lied to the prosecutors regarding Mr. Besedin's actions on February 7, 2017. For all these reasons, the jury correctly found that Mantovani initiated the criminal prosecution. *Bermudez v. City of New York*, 790 F.3d 368, 377 (2d Cir. 2015) (citation omitted).

**D.    Defendants did not preserve their arguments regarding a lack of probable cause, a lack of malice or qualified immunity because they never articulated any facts in their Rule 50(a) motion to support these arguments**

The relevant part of defendants' Rule 50(a) application can be found at pages 824-36 of the trial transcripts. Regarding Mr. Besedin's malicious prosecution claim, the lion's share of their motion involved the detailed but erroneous argument that Mantovani did not initiate the criminal prosecution. (Tr. 828-31.) Concerning the issue of probable cause, counsel simply stated that "we believe that these should be dismissed for -- because there's probable cause for all of the arrested offenses as well, which, as this Court knows, is a requirement, the absence of probable cause is a requirement to pursue for malicious prosecution." (Tr. 832.) And while counsel discussed probable cause to arrest Mr. Besedin for Harassment in the context of his false arrest claim, there was no discussion of probable cause to arrest for Resisting Arrest or Assault in the Second Degree. There was also no argument directed at the element of malice. Regarding defendants' entitlement to qualified immunity, counsel simply stated the following: "Just that we believe the officers are entitled to qualified immunity, Your Honor, and any review of their actions should give that standard indifference with a sprinkling of conclusory statements that the defendants were entitled to judgment as a matter of law." (Tr. 835.)

None of the facts the defendants articulate now in support of their Rule 50(b) motion that

-13-

probable cause existed to arrest and prosecute Mr. Besedin for Resisting Arrest and Assault in the Second Degree (Defs. Memo at 14-16) were mentioned in their Rule 50(a) motion. And none of the facts the defendants articulate now in support of their Rule 50(b) motion that Mr. Besedin failed to establish actual malice (Defs. Memo at 16-17) were mentioned in their Rule 50(a) motion. In *Lore*, the Second Circuit reemphasized that Rule 50(a)(2)'s specificity requirement was mandatory. 670 F.3d at 152-53. By failing to articulate any facts in support of their Rule 50(a) motion, defendants deprived Mr. Besedin of the opportunity to cure any alleged defects in the sufficiency of her proof. *Galdieri-Ambrosini*, 136 F.3d at 286-87. Thus, defendants have waived their right to seek judgment as a matter of law on these claims. *Tretola v. County of Nassau*, 14 F. Supp.3d 58, 79 (E.D.N.Y. 2014).

Regarding defendants' claim of entitlement to qualified immunity, the Court should deny the motion because their Rule 50(a) motion did not satisfy Rule 50(a)(2)'s specificity requirement. As noted, the defendants merely mouthed qualified immunity (Tr. 835), which presumes an underlying constitutional deprivation. *Askins v. Doe*, 727 F.3d 248, 253-54 (2d Cir. 2013). They did not articulate any facts to support their contentions. As such, defendants did not put Mr. Besedin on notice that they were seeking to dismiss these claims for a lack of evidence. *See Greenaway v. County of Nassau*, 327 F.Supp.3d 552, 561-62 (E.D.N.Y. 2018).

**E.      Ample evidence existed to support the jury's findings of liability regarding Mr. Besedin's malicious prosecution claim.**

Defendants' arguments regarding the existence of probable cause, the absence of malice and qualified immunity also fail on the merits. Regarding probable cause, Mr. Besedin only had to establish that probable cause was lacking for any of the charged offenses. *Kee*, 12 F.4th at 166 ("Although probable cause to prosecute is a complete defense to a claim of malicious prosecution,

-14-

. . . such probable cause must be shown as to each crime charged in the underlying criminal action. . . .") (citations omitted). *See Chiaverini v. City of Napoleon*, 602 U.S. 556 (2024). Here, the jury easily found that defendants lacked probable cause to arrest him for Resisting Arrest and Assault in the Second Degree.

Regarding Assault in the Second Degree, the Court instructed the jury as follows: "a person is guilty of assault in the second degree when, with intent to prevent a police officer from performing a lawful duty, he causes physical injury to such police officer." Regarding Resisting Arrest, the Court instructed the jury in relevant part as follows: "a person is guilty of resisting arrest when he intentionally prevents or attempts to prevent a police officer or a peace officer from effecting an authorized arrest of himself or another person." (Tr. 943.) According to defendants, Mr. Besedin resisted arrest by "refusing to comply with a lawful order of the police to place his hands behind his back and submit to an arrest for slapping [Beckwith's] outstretched hand while [Beckwith] was giving the defendant lawful orders to back away from the police officers conducting a police investigation." (Tr. 111.) Brewington Dec. at Exh. 5. They also claim that he committed Assault in the Second Degree by "after being advised that he was under arrest by Officers Beckwith and Mantovani and to place his hands behind his back, did violently flail his arms, kick and scream, and push Officer Mantovani down 4 steps on the exterior of his home[,]" which caused Mantovani injuries, including a sprained left ankle. Brewington Dec. at Exh. 6. The surveillance video (Plaintiff's Exh. 13-A) belied, if not outright refuted these claims, and Mr. Besedin testified that he never hit either of the defendants or made any contact with them before being hurled down the stairs. (Tr. 454-55.) Probable cause is lacking when an officer knows that an arrestee did not commit the crimes for which he was arrested. *Ricciuti v. New York City Trans. Auth.*, 124 F.3d 123, 130-31 (2d Cir. 1997); *Cook v. Sheldon*, 41 F.3d 73, 79 (2d Cir. 1994)

-15-

For these same reasons defendants' arguments regarding malice fail. As noted, the jury could readily find that Beckwith and Mantovani knowingly leveled false charges against Mr. Besedin. This is malice personified. *Cameron*, 598 F.3d at 69 (recognizing that the intentional leveling of false charges against an arrestee constitutes malice).

Nor are defendants entitled to qualified immunity. "Qualified immunity protects public officials performing discretionary functions from personal liability in a civil suit for damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known. . . . Whether qualified immunity applies turns on the objective legal reasonableness of the action, assessed in light of the legal rules that were clearly established at the time it was taken. . . . [A] right is clearly established if it would be clear to a reasonable [public official] that his conduct was unlawful in the situation he confronted." *Morse v. Fusto*, 804 F.3d 538, 546 (2d Cir. 2015).

"A clearly established right is one that is sufficiently clear that every reasonable official would have understood that what he is doing violates that right." *Mullenix v. Luna*, 577 U.S. 7, 11 (2015) (citation omitted). A case on all fours is not required to place officers on notice. Cases with fundamentally or materially similar facts are not required so long as the officer had "fair warning" that the conduct in which (s)he engaged was unconstitutional. The law can be clearly established even when "the very action in question" has not "previously been held unlawful" so long as the unlawfulness of the actions was "apparent" "in light of pre-existing law." *Hope v. Pelzer*, 536 U.S. 730, 739 (2002) (citations omitted). *See Edrei v. Maguire*, 892 F.3d 525, 541-43 (2d Cir. 2018) (citation omitted).

Defendants never requested that the jury answer special interrogatories. As such, the Court must view the evidence most favorably to Mr. Besedin when considering defendants' claim of

-16-

qualified immunity. *Zellner v. Summerlin*, 494 F.3d 344 (2d Cir. 2007). As of February 7, 2017, it was clearly established that subjecting a person to a criminal prosecution based upon false charges violated the Fourth Amendment. *See Coggins v. County of Nassau*, 988 F. Supp. 2d 231, 245 & n.8 (E.D.N.Y. 2013), *aff'd sub nom. Coggins v. Buonora*, 776 F.3d 108 (2d Cir. 2015). *See Coggins*, 776 F.3d at 114. Drawing all inferences in Mr. Besedin's favor, the jury had ample evidence to conclude that Beckwith and Mantovani subjected him to a baseless prosecution for the charges of Resisting Arrest and Assault in the Second Degree.

The jury's finding of malicious prosecution and its punitive damages award meant that the jury had explicitly rejected their contentions, thus foreclosing any entitlement to qualified immunity. As Judge Gleeson noted in *Robertson v. Sullivan*, 07-cv-1416, 2010 U.S. Dist. LEXIS 46691, *13-14 (E.D.N.Y. May 12, 2010),

> with respect to the qualified immunity issue, the jury's award of punitive damages makes the defendants' claims seem especially hollow. The jury exercised its authority to award not only compensatory damages but punitive damages as well -- on each defendant. It could do so only upon a finding that each defendant acted "maliciously or wantonly, that is, if [the defendant] was prompted by ill will or spite toward the plaintiff or [acted with] a reckless or reckless or callous disregard or indifference to the plaintiffs' rights." Tr. 555 (jury charge)[.] The jury having found that each defendant deserved to be punished for engaging in such behavior, it is difficult to fathom the defendants' post-verdict claim that I should find them immune on the ground that [*sic?*] acted in an objectively reasonable manner.

*Id. See Drayton v. City of New York*, 17-cv-7091, 2022 U.S. Dist. LEXIS 207165, *10 (E.D.N.Y. Dec. 2, 2022) (Cogan, J.) (same); *Adedeji v. Hoder*, 935 F. Supp. 2d 557, 570-71 (E.D.N.Y. 2013) (Amon, J.) (same).

-17-

**F.    Ample evidence existed to the support the jury's findings of liability regarding Mr. Besedin's malicious abuse of process claim.**

Defendants advance two arguments in seeking judgment as a matter of law with respect to the jury's verdict on Mr. Besedin's malicious abuse of process claim.  First, they contend that probable cause existed for his criminal prosecution.  Next, they contend "the evidence presented at trial failed to demonstrate that Defendants sought to obtain a collateral objective outside the legitimate ends of the process."  Defs. Memo at 20-21.  Mr. Besedin demonstrates above that probable cause was lacking for the criminal prosecution.  He demonstrates below that the evidence at trial permitted the jury to find that he established a collateral objective.

Similar to a malicious prosecution claim, courts borrow the elements of a malicious abuse of process claim from New York law. "In New York, a malicious abuse of process claim lies against a defendant who (1) employs regularly issued legal process to compel performance or forbearance of some act (2) with intent to do harm without excuse or justification, and (3) in order to obtain a collateral objective that is outside the legitimate ends of the process." *Cook*, 41 F.3d at 80 (citations omitted).  In its summary judgment decision, the Court identified a number of circumstances that satisfied the collateral objective element of the claim.  Those included "procuring a search warrant to steal someone's property, issuing a criminal process to avoid personal liability, and fabricating an assault charge to save one's employment." *Besedin v. County of Nassau*, 18-cv-819, 2024 U.S. Dist. LEXIS 168488, *42-43 (E.D.N.Y. Sept. 18, 2024) (citations omitted).  In *Cook*, *supra*, the Second Circuit found the collateral objective element satisfied when they decided to prosecute the plaintiff out of vengeance because he had advised one of his co-arrestees to assert his rights. *Cook*, 41 F.3d at 77, 80.

-18-

Ample evidence existed to support the jury's conclusion that the defendants acted for a collateral objective. Again, based on the video evidence and Mr. Besedin's testimony, the jury could readily find that Beckwith and Mantovani fabricated the serious charges to protect Mantovani from criminal prosecution, to protect both defendants from personal civil liability or losing their job. This was particularly the case because Mantovani was so invested in achieving these goals that he told the DA's Office that he "wanted to proceed with the felony," and that he wanted Mr. Besedin to be found guilty of the felony. (Tr. 318.) *See Besedin*, 2024 U.S. Dist. LEXIS 168488, *42-43 (citations omitted). The jury's verdict is also supported by the fact that both defendants pressed a claim of wrongdoing at trial despite the clear video evidence to the contrary. In sum, they wanted to avoid their own personal exposure.

Finally, defendants claim they are entitled to qualified immunity with respect to Mr. Besedin's malicious abuse of process claim. For the same reasons detailed above, this claim is not preserved. *Greenaway*, 327 F.Supp.3d at 561-62. And the law has been clearly established since *Cook*, *supra*, that one cannot employ process maliciously and for an improper purpose.

**G. The jury's verdict is neither seriously erroneous nor a miscarriage of justice,**

Rule 59 of the Federal Rules of Civil Procedure provides, in relevant part, that a new trial may be ordered "for any reason for which a new trial has heretofore been granted in an action at law in federal court." Fed. R. Civ. Proc. 59(a). In *DLC Mgmt. Corp. v. Town of Hyde Park*, 163 F.3d 124 (2d Cir. 1998), the Second Circuit articulated the standards governing the Court's review:

> As a general matter, [a] motion for a new trial should be granted when, in the opinion of the district court, the jury has reached a seriously erroneous result or . . . the verdict is a miscarriage of justice. . . . A new trial may be granted, therefore, when the jury's verdict is against the weight of the evidence. . . . The standards governing a district court's consideration of a Rule 59 motion for a new trial on the grounds that the verdict was against the weight of the evidence differs in two significant ways from the standards governing a Rule 50 motion for judgment as a matter of law.

-19-

> Unlike judgment as a matter of law, a new trial may be granted even if there is substantial evidence supporting the jury's verdict. Moreover, a trial judge is free to weigh the evidence himself, and need not view it in the light most favorable to the verdict winner. . . . A court considering a Rule 59 motion for a new trial must bear in mind, however, that the court should only grant such a motion when the jury's verdict is egregious. Accordingly, a court should rarely disturb a jury's evaluation of a witness's credibility.

*Id.* at 133-34 (quotations and citations omitted).

Defendants proffer no independent arguments in support of their requests for a new trial. Regarding the jury's malicious prosecution verdict, they simply state in their introductory paragraph that "[t]he evidence presented at trial failed to establish the necessary elements of a claim for malicious prosecution. As such, Defendants are entitled to judgment as a matter of law. Alternatively the jury verdict with respect to this claim should be set aside." Defs. Memo at 10. Regarding the jury's malicious abuse of process verdict, they conclude their arguments as follows: "Plaintiff's abuse of process claim should be dismissed as a matter of law or set aside." Defs. Memo at 24.

Mr. Besedin demonstrates above that the jury's verdict was sound regarding both claims. The Court should deny this aspect of the defendants' motion because the jury's verdict rested entirely on its assessment of the evidence, which necessarily included the conclusion that the defendants had repeatedly lied on the witness stand. *Raedle v. Credit Agricole Indosuez*, 670 F.3d 411, 418-20 (2d Cir. 2012) (in reversing the district court's grant of a Rule 59 motion for a new trial the Court stated that "where, as here, a verdict is predicated almost entirely on the jury's assessments of credibility, such a verdict generally should not be disturbed except in an egregious case, to correct a seriously erroneous result, or to prevent a miscarriage of justice," and emphasized that it uniquely the jury's province to assess credibility).

-20-

# POINT III

## THE JURY'S AWARD OF PUNITIVE DAMAGES REFLECTS ITS RECOGNITION THAT MANTOVANI RUTHLESSLY ATTACKED MR. BESEDIN AND THEN BOTH DEFENDANTS ATTEMPTED TO COVER THEIR TRACKS BY FRAMING MR. BESEDIN FOR CRIMES HE DID NOT COMMIT

In a submission best characterized as ostrich-like, defendants ignore the significance of the jury's findings. They also ignore that the jury easily concluded that they sought to cover their tracks by attempting to frame Mr. Besedin for crimes he did not commit, and then lied to everyone at every step of the way, including the jury.

**A. The standards governing remittitur**.

In *Lee v. Edwards*, 101 F.3d 805 (2d Cir. 1996), the Second Circuit articulated the criteria governing a review of an award of punitive damages:

> Punitive damages are available in a § 1983 action "when the defendant's conduct is shown to be motivated by evil motive or intent, or when it involves reckless or callous indifference to the federally protected rights of others." *Smith v. Wade*, 461 U.S. 30, 56 (1983). Although a jury has wide discretion, a district court may refuse to uphold a punitive damage award when the amount is "so high as to shock the judicial conscience and constitute a denial of justice." . . . .
>
> * * *
>
> [T]he Supreme Court [has] erected three guideposts that should assist us in the application of our standard, by which we deem excessive a punitive damage award that "shocks our judicial conscience," *Hughes*, 850 F.2d at 883. These guideposts include: (1) the degree of reprehensibility of the tortious conduct; (2) the ratio of punitive damages to compensatory damages; and (3) the difference between this remedy and the civil penalties authorized or imposed in comparable cases. *Gore*, [517 U.S. at 575]. . . .

*Lee*, 101 F.3d at 808-09.

When considering a motion for *remittitur*, the Court must view the evidence in a light most favorable to Mr. Besedin. *Payne v. Jones*, 711 F.3d 85, 98-99 n.10 (2d Cir. 2012). "[T]he ultimate question is whether the award 'shock[s] the judicial conscience' or amounts to a miscarriage of

justice." *Jennings v. Yurkiw*, 18 F.4th 383, 389 (2d Cir. 2021) (quotation omitted). As the Second Circuit noted in *Jennings*, "determining the amount of damages is a quintessential responsibility of juries." *Id*. at 390.

The jury appropriately assessed punitive damages against each defendant. *Gagnon v. Ball*, 696 F.2d 17, 19 n.2 (2d Cir. 1982). The jury did not simply award punitive damages based upon a single act. It considered the officers' conduct as a whole and awarded punitive damages, as instructed, for the officers' callous disregard for Mr. Besedin's constitutional rights and well-being. (JA 957-58.) Each of the "guideposts" identified in *BMW of North America, Inc. v. Gore*, 517 U.S. 559 (1996), supported the jury's punitive damages award.

### 1. Reprehensibility.

"Reprehensibility" is often the most critical factor in weighing a punitive damages award. *Gore*, 517 U.S. at 575. *See DiSorbo v. Hoy*, 343 F.3d 172, 187-88 (2d Cir. 2003) (recognizing the second and third *Gore* factors frequently supply little guidance to the reviewing court); *Lee*, 101 F.3d at 810-11 (same). Reprehensibility is best assessed by focusing on the following non-exclusive aggravating factors: "(1) whether a defendant's conduct was marked by violence or presented a threat of violence; (2) whether a defendant's conduct evidenced trickery or deceit as opposed to mere negligence, and (3) whether the record supports a finding of intentional malice." *Jennings*, 18 F.4th at 390 (citation omitted). Here, the defendants' actions were violent (Mantovani body slammed a 72-year old man onto the concrete sidewalk without justification and then shoved him backwards down onto the concrete steps), callous (they denied him prompt medical assistance) and deceitful (they repeatedly lied about Besedin's actions to justify Mantovani's unconstitutional use of force).

-22-

The jurors watched how Mantovani preyed on Mr. Besedin, a defenseless 72-year old man. They saw Mantovani place his arm around Mr. Besedin's neck and hurl him down the steps of his front porch and onto the concrete walkway. Plaintiff's Exh. 13-A. After the defendants placed Mr. Besedin in handcuffs, they saw Mantovani forcefully shove him onto the concrete steps and how he then rolled over in pain. Plaintiff's Exh. 13-B. They also heard and saw Mantovani refuse to acknowledge what he did. The use of gratuitous violence on a non-resisting person warrants the imposition of a significant award of punitive damages. *Jennings*, 18 F.4th at 390-91; *DiSorbo*, 343 F.3d at 187; *Alla v. Verkay*, 979 F. Supp.2d 349, 378 (E.D.N.Y. 2013).

In *Jennings*, the Second Circuit found that the defendants' failure to obtain medical attention requested by the plaintiff weighed heavily in the reprehensibility calculus. *Jennings*, 18 F.4th 390-91. Here, the jury readily inferred that Mr. Besedin needed medical attention in the wake of Mantovani's actions and the injuries identified in Plaintiff's Trial Exhs. 21-27, but did not get any as he sat in a cell, covered with his own urine, until hours later. Even then, it was the desk officer, not Beckwith, who requested medical attention for Mr. Besedin. (Tr. 52). The jury readily rejected defendants' testimony that Mr. Besedin was not injured as a result of Mantovani's actions. But instead of insuring that Mr. Besedin be seen at the hospital, and even then solely for a fitness for confinement evaluation (Tr. 755-56), Mantovani sought medical care on behalf of himself. (Tr. 373).

The jury's punitive damages awards also reflected the deceitful nature of the defendants' actions. The jurors saw that Mr. Besedin did not resist arrest or assault either defendant. Yet Beckwith and Mantovani charged him with Assault in the Second Degree and Resisting Arrest. Assault in the Second Degree is a class D felony. N.Y. Penal L. § 120.05. Mr. Besedin faced seven years in prison. N.Y. Penal L. § 70.00.

-23-

The jurors heard from the defendants and witnessed with their eyes the calculating efforts

of Beckwith and Mantovani, which included their lies to the DA's Office and the changing of their

testimony at trial.   Before they learned of the existence of the video surveillance, the defendants

claimed that Mr. Besedin, "after being advised that he was under arrest by Officers Beckwith and

Mantovani, and to place his hands behind his back, did violently flail his arms, kick and scream, and

push Officer Mantovani down 4 steps on the exterior of his home."  (Brewington Dec. at Exh. 6; Tr.

116-17.)   But after they learned of the video's existence, their testimony changed.   No longer did

Mr. Besedin "violently flail his arms, kick and scream, and push Officer Mantovani down 4 steps

on the exterior of his home."   Instead, according to Mantovani, Mr. Besedin "was able to propel

himself and, like, drive with his hands towards us, not physically off the house."   (Tr. 343.)

Montovani's changed testimony was contradicted by Beckwith.   Beckwith's willingness to skew the

facts and ignore the evidence was clear to the Jury:

Q I understand that's what you wrote. Is it your testimony that Mr. Besedin flailed his arms?
A Yes.
Q Is it your testimony that Mr. Besedin kicked?
A Yes.
Q Is it your testimony that he pushed Officer Mantovani down four steps?
A Yes.
Q Even after watching the video?
A Yes.

(Tr. 114:21-115:5.)   As Beckwith also testified, "I'm struggling with him attempting to turn him

around, but he's pushing back. So pushing us back towards the staircase." (Tr. 174-75.) Mantovani,

however, testified that he stumbled "backward with the momentum from Mr. Besedin. I was going

backwards, and as I was falling back and I was on that first step after stepping, or overstepping

backwards, I was going back. And at this point I decided to turn and rotate, again, just trying to

preserve myself and, again, not fall backwards down the stairs with Mr. Besedin and Officer

-24-

Beckwith on top of me." (Tr. 367-68.)  Given the virtually identical versions of events provided to the DA's Office, and then the emergent cracks in their stories while trying to salvage their falsehoods in their testimony provided at trial, the jury readily concluded that the defendants conspired to cover up their wrongdoing. *See Pearl v. City of Long Beach*, 296 F.3d 76, 87 (2d Cir. 2002) ("Knowing what [plaintiff] contends the true facts were, he had reason to believe they were lying, and, because their versions were identical, it was a reasonable inference that the officers had agreed to present their allegedly false versions.")

Falsely accusing a citizen of a crime is "egregious and reprehensible." *Lee*, 101 F.3d at 810. *See Garnett v. Undercover Officer C0039*, 838 F.3d 265, 275 (2d Cir. 2016) (quotation omitted). Mantovani's and Beckwith's falsely accusing Mr. Besedin of violent behavior necessitating Mantovani's use of force culminated in the commencement of a baseless criminal prosecution that exposed Mr. Besedin to up to seven years in prison.

Mr. Besedin would be remiss if he did not mention two additional factors that supported the jury's punitive damages awards.  As President Nixon learned the hard way, the cover up can be worse than the crime. *Bridgeview Health Care Ctr. v. Clark*, 09 C 5601, 2012 U.S. Dist. LEXIS 184089, at *13-14 n.5 (E.D. Ill. Sep. 28, 2012).  Time and again courts have recognized that a defendants' efforts to hide his or her acts of misconduct weigh heavily in the reprehensible calculus. *Jennings*, 18 F.4th at 391 ("The reprehensible nature of the officers' conduct is underscored by the elaborate steps they took to cover up their misconduct."); *Bogle v. McClure*, 332 F.3d 1347, 1359, 1362 (11th Cir. 2003) (recognizing that the defendants' reprehensible racial discrimination was accompanied by post-discrimination conduct covering up their wrongful intent warranted punitive damage awards of $1,900,000 to each of seven plaintiffs and imposed on the board of trustees for a public library system and its director); *Fresh v. Entm't U.S.A., Inc.,* 340 F. Supp. 2d 851, 858-59

-25-

(W.D.Tenn. 2003) (in an action alleging claims of assault, battery and false imprisonment, the trial court found the company's cover up of intentional wrongdoing relevant to a finding of reprehensibility, and remitted the punitive damages award to $717,610.36).

The jury also appropriately considered the bold falsehoods the defendants told at every step of the way. The jury watched the video multiple times and examined the language in the accusatory instruments and concluded that Mr. Besedin neither resisted arrest nor assaulted Mantovani. The jury heard and saw Beckwith's arrest report, which falsely stated that "At this time, the defendant did then violently swing his arm and struck Police Officer Beckwith outstretched hand." (Tr. 147-48.) And it heard Mantovani falsely deny that which was plain for everyone to see; that he had grabbed Mr. Besedin around the neck and hurled him off the porch and onto the concrete stairs. (Tr. 313-14.) Mantovani stood up in the witness stand and shamelessly told the jury, "Again, my arm is not around his neck. My hand is grabbing the back of his head. Optically it looks like it's on his neck, but at no point am I grabbing him by his neck." (Tr. 343.) The video and documentary evidence laid bare for the jury that the one and only thing the defendants were concerned with was protecting themselves. *Jennings*, 18 F.4th at 391 ("The jury heard and was entitled to consider a record that included falsified charging documents, false accounts of the beating, faked or exaggerated injury, and perjured trial testimony.").

In reaching its punitive damages awards, the jury readily concluded that the defendants chose not to take seriously the oath that every witness takes – to tell the truth. It was evident that the jury rejected Mantovani's and Beckwith's urging to deny what the jurors saw with their own eyes. And it was equally clear that the jury rejected Beckwith's tacit request for sympathy when he told the jury this was his first arrest. (Tr. 144, 156.)

-26-

**2.    The ratio of punitive damages to compensatory damages**.

In order to determine if there is a permissible ratio of punitive damages to compensatory damages, "the proper inquiry is whether there is a reasonable relationship between the punitive damages award and the harm likely to result from the defendant's conduct as well as the harm that actually occurred." *Gore*, 517 U.S. at 581 (quotation marks and citations omitted). The Second Circuit has emphasized that this factor weighs little in its analysis. *Payne*, 711 F.3d at 103. *See Lee*, 101 F.3d at 811. While the damages awards are high, there is nothing about a slightly less than 1:2.1 ratio that raises eyebrows. As the *Jennings* Court recognized,

> Even where compensatory damages are substantial, punitive damages awards that are a multiple higher may be warranted because of the deterrent function of punitive damages. The purpose of § 1983 is not only to provide compensation to the victims of past abuses, but to serve as a deterrent against future constitutional deprivations, as well. . . . Because of this deterrent function, extra-compensatory damages are warranted where the misconduct was designed to escape detection. . . . Where the injurer makes active efforts to conceal the harm, [underdeterrence] is of course exacerbated. . . . Given the extensive misconduct directed at escaping liability, the deterrent capacity of the 1:4 ratio presented here passes muster.

*Jennings*, 18 F.4th at 392 (citation, quotations and footnotes omitted).

**3.    Comparable civil or criminal penalties.**

District courts may also compare punitive damages awards to civil or criminal penalties for similar conduct to insure that defendants had adequate notice of the severity with which society views their actions. *Gore*, 517 U.S. at 583-84. The defendants only address this factor regarding Beckwith, claiming incorrectly that the appropriate measures are "criminal and civil penalties imposed by the state's law for the misconduct in question." Defs. Memo at 27. The appropriate comparison is 18 U.S.C. § 242. If convicted, Mantovani could face ten years in jail (*id.*), and a fine of $250,000. 18 U.S.C. § 3571(b)(3). *Jennings*, 18 F.4th at 392-93. While defendants claim "that Beckwith's conduct subjected him to a Class A misdemeanor punishable by a fine of up to

-27-

$100,000" (Defs. Memo at 26-27), they ignore that Beckwith's lies at trial subject him to prosecution under 18 U.S.C. §§1621, 1623, for which he faces up to five years imprisonment (*id*.) and a fine of $250,000.  18 U.S.C. § 3571(b)(3).  Perhaps more significant, under New York law Perjury in the first degree § 210.15 is a class D felony that carries a sentence of up to 7 years, a probation term of 5 years, and payment of a substantial fine.  Defendants could also be subjected to Penal Law § 175.10,  Falsifying business records in the first degree, also a class D Felony.  These offenses, along with charges of Official Misconduct under NY Penal Law  195.00, a class "A" misdemeanor punishable by up to one year in jail, demonstrate that there were serious ramifications of which the Defendants had notice.

### 4. Relevant case law.

Relying on case law that ignores the import of *Jennings*, the defendants suggest a realm of punitive damages awards in cases that ignore the gravity of their conduct.  Defs. Memo at 27-31. *Jennings* makes clear that the Court's "task is not to balance the number of high and low awards and reject the verdict . . . if the number of lower awards is greater."  *Jennings*, 18 F.4th at 393.  Because the Court must assess the jury's award against each defendant separately, Mr. Besedin starts with Mantovani before turning to Beckwith.

Defendants ignore the heinous nature of Mantovani's actions.   Using *Jennings* as a yardstick, they claim that the "actions of the officers in *Jennings* are far more drastic than those of Defendant Mantovani.  First, the jury did not hear of any elaborate steps by Defendant Mantovani to 'cover up' his misconduct.  In fact, the jury heard Defendant Mantovani did not create the charging document. . . .  He did not sign any affidavits that were used in charging the Plaintiff. . . .  There is no record of him lying to the NCDA. . . ."  Defs. Memo at 31.

-28-

There is much wrong with the defendants' analysis, including their treatment of *Jennings* as a ceiling, above which no punitive damages award can rise. *Jennings* makes clear that the $250,000 award against Yurkiw is not a ceiling. *Jennings*, 18 F.4th at 393-94. Defendants also ignore that the jury heard a blood curdling admission from Mantovani. Knowing that Mr. Besedin was innocent, he told the DA's Office that he "wanted to proceed with the felony," and that he wanted Mr. Besedin to be found guilty of the felony. (Tr. 318-19.) This represents evil incarnate.

Defendants incorrectly contend that Mantovani did not engage in any misconduct concerning Mr. Besedin's prosecution. The jury readily found that Mantovani and Beckwith had plenty of time to get their stories straight in an effort to frame Mr. Besedin. As detailed above, they told the same story to the DA's Office. Mantovani went to the DA's Office two or three times; at least twice with Beckwith. Mantovani knew that Mr. Besedin was being charged with felony assault and he answered questions posed by the DA's Office about those charges. (Tr. 301-03.) As Mantovani testified in response to the question about going to the prosecutor's office to assist in the prosecution of the case, "I wouldn't say assist technically, I mean, we were there giving our statements and recollection of what happened that evening." (Tr. 302.) The jury's verdict correctly reflected that Mantovani's "statements and recollection of what happened" were blatant lies.

Mantovani also failed to prevent the prosecution of Mr. Besedin for crimes he knew he did not commit. While Mr. Besedin did not proceed on a failure to intervene theory (although raised earlier in the litigation), this Court has recognized "that even acts of misconduct which do not themselves form an independent basis of liability may nonetheless be relevant to a jury's assessment of punitive damages if there exists a 'nexus' between that misconduct and other conduct that gave rise to liability." *Martinez v. City of New York*, 16-CV-79, 2023 U.S. Dist. LEXIS 124623, *580 (E.D.N.Y. Jul. 19, 2023) (citing *Jennings*, 18 F.4th at 391 n.3).

-29-

In *Alla*, *supra*, Judge Block upheld a total punitive damages award of $300,000 against defendant Verkay for false arrest ($150,000) and excessive force ($150,000). *Alla*, 979 F. Supp. 2d at 373-75, 378-79. That translates into more than $405,000 in today's dollars. Verkay's use of force involved a single-blow to Gad Alla's head, which caused a break of his zygomatic arch. *Id.* at 357-58, 364. While Verkay falsely arrested Gad Alla, he did not falsify charges against him, and, as such, he never faced jail time as did Mr. Besedin.

In *Fresh, supra*, the jury found that the defendants had committed the torts of assault, battery and false imprisonment. As relevant here, the jury awarded "$ 4,402.59 in medical expenses, $175,000.00 in compensatory damages, and $ 2,161,540.00 in punitive damages." *Fresh*, 340 F. Supp. 2d at 855. The district court found the punitive damages award violated the Due Process Clause, and remitted the punitive damages award to $717,610.36, which translates to $1,228,437.58 in today's dollars. Critical to its finding was the company's cover up of intentional wrongdoing. *Id.* at 858-60.

Beckwith advances two arguments in his effort to reduce the punitive damages award. First, he claims that the jury's finding that he did not use excessive force requires a reduction. Defs. Memo at 25. Second, Beckwith seeks mercy from the Court because this was his first arrest. Defs. Memo at 25-26.

Beckwith asks the Court to treat his misconduct as an isolated event. It was not. Time and again Beckwith had choices. He could have immediately chosen to tell the truth about what happened to his superiors. He did not and never did. He could have chosen to tell the truth to the DA's Office, including on those occasions when he went there with Mantovani. He did not and never did. He could have chosen to tell the truth to IAB. He did not and never did. And he could have chosen to tell the truth to the jury. Again, he did not and missed his opportunity to correct the

-30-

record. Thus, each time Beckwith had the opportunity to stop the lie he chose instead to double down, allowing the jury to conclude that his actions were not the product of a newborn police officer, as he wanted the jury to believe and hopes the Court will embrace, but of a callous, deceitful liar willing to place his own interests above all others, including, most important, Mr. Besedin. His acts were insidious. He showed an all too willingness to plot and plan against an innocent 72-year old man, and he did so believing he would escape this treachery.

In *Martinez*, *supra*, this Court upheld punitive damages awards of $100,000 against four members of the NYPD. As the Court knows well, none of the officers were found liable for malicious prosecution, excessive force or malicious abuse of process. Instead, the jury found them liable on the theory of deliberate indifference to plaintiff's serious medical needs and "awarded Plaintiff $1 in nominal damages, and $100,000 in punitive damages. . . for a total punitive damages award of $400,000." *Martinez*, 2023 U.S. Dist. LEXIS at *20. In doing so, the Court found the defendants' conduct particularly reprehensible in light of their conscious decision to "deliberately force[] Plaintiff to endure a multi-hour delay after sustaining extremely painful physical injuries in their custody before she was provided with access to any medical care. The jury concluded that each individual officers knew that Plaintiff was experiencing extreme pain. Plaintiff testified that she repeatedly begged for medical care. Nonetheless, the four individual officers let Plaintiff, who had just been subjected to a violent assault by one or more NYPD officers while in handcuffs, and over whom the individual defendants had absolute control, remain in pain and without access to treatment for hours." *Id.* at *53-54.

Also instructive are the Second Circuit's recent decision in *Gilead Cmty. Servs. v. Town of Cromwell*, 12 F.4th 93 (2d Cir. 2024), and the Eleventh Circuit's decision in *Bogle v. McClure*, 332 F.3d 1347 (11th Cir. 2003). In *Gilead Cmty. Servs.*, the plaintiff brought suit pursuant to, among

-31-

other things, the Fair Housing Act. "A jury found the town of Cromwell, Connecticut liable for a campaign of discriminatory conduct meant to keep a group home for individuals with mental health disabilities from opening in the town, in violation of the Fair Housing Act (FHA) and Americans with Disabilities Act." *Id.* at 95. In reducing the jury's punitive damages award of $5,000,000 to $2,000,000, the Court noted the following:

> there was ample evidence of highly reprehensible conduct by the town of Cromwell. The town engaged in a deliberate and sustained campaign of discrimination and retaliation, reflecting repeated actions rather than an isolated incident and resulting from intentional malice rather than "mere accident. . . . The town also evinced an indifference to or reckless disregard of the health or safety of others, when its police officers leaked sensitive medical information about a Gilead resident to the public and failed to investigate an episode of vandalism of Gilead's group home. . . . And the ultimate targets of the town's conduct, the residents with disabilities who relied on Gilead's housing, had financial vulnerability. Finally, it bears remembering that Cromwell officials not only violated the FHA but also publicly celebrated when their discriminatory efforts succeeded in keeping Gilead's residents out of town. This is a case where further sanctions beyond compensatory damages are warranted to achieve punishment [and] deterrence.

*Id.* at 106.

In *Bogle*, the Eleventh Circuit upheld punitive damage awards of $1,900,000 to each of seven plaintiffs and imposed on the board of trustees for a public library system and its director. In so doing, the *Bogle* Court recognized that the defendants' reprehensible racial discrimination was accompanied by post-discrimination conduct covering up their wrongful intent warranted. *Bogle*, 332 F.3d at 1359, 1362.

Mr. Besedin recognizes that cases like *Gilead Cmty. Servs.* and *Bogle* involved claims of employment and housing discrimination. Without minimizing the scourge of unlawful discrimination and the harm it wreaks, police misconduct is different in kind. Here, Mantovani

-32-

viciously assaulted a defenseless man. Mantovani and Beckwith then denied him prompt medical care. They actively lied to police and prosecutorial personnel, and the jury to cover up their actions. Punitive damages are awarded in the jury's discretion to punish a defendant for outrageous conduct, and to deter him or her, and others in the same position, from engaging in similar conduct in the future. *Smith v. Wade*, 461 U.S. 30, 49 (1983). If recent events teach us anything, such actions have not abated. Mr. Besedin agrees that unlawful discrimination is a scourge that plagues society and must be eradicated; so too must the defendants' conduct in this case, which was far more egregious than the conduct in *Bogle* and *Gilead Cnty Servs.*

### POINT IV

### AMPLE EVIDENCE EXISTED OF PHYSICAL INJURIES, LONG-TERM DETERIORATION OF MENTAL HEALTH AND LOSS OF LIBERTY TO SUSTAIN THE JURY'S COMPENSATORY DAMAGES AWARD

Defendants contend that the jury's compensatory damages award of $760,000 is excessive. Like their arguments relating to punitive damages, defendants fail to view the evidence in a light most favorable to Mr. Besedin and the case law they rely upon is inapposite. In fact, defendants' arguments all but ignore the damages Mr. Besedin suffered as a result of his criminal prosecution.

**A. The standards governing this Court's review of compensatory damages.**

In requesting that the Court remit the jury's awards of compensatory damages, defendants once again fail to view the evidence in a light most favorable to Mr. Besedin. *Payne*, 711 F.3d at 98-99 n.10. Generally, the "calculation of damages is the province of the jury and [courts] will not vacate or reduce a jury award merely because [they] would have granted a lesser amount of damages." *Dancy v. McGinley*, 843 F.3d 93, 113 (2d Cir. 2016) (quotations and ellipses omitted). When considering a motion for remittitur, "[t]he district court's role is limited to determining whether the award is so high as to shock the judicial conscience and constitute a denial of justice."

-33-

*Id.* at 113 (quotations and citations omitted). District courts look to comparable cases for guidance, though courts are to "examine each case individually as a unique set of facts and circumstances. Thus, while a review of comparable cases is appropriate, we need not average the high and low awards; we focus instead on whether the verdict lies within [the] reasonable range." *Id.* (quotations and citations omitted).

Courts should only "reduce the award to the maximum amount that would be upheld by the district court as not excessive." *Rangolan v. County of Nassau*, 370 F.3d 239, 244 (2d Cir. 2004) (quotation omitted). When comparing awards from years ago, courts must make adjustments for inflation. Courts frequently use the Bureau of Labor Statistics Consumer Price Index Inflation Calculator located at https://www.bls.gov/data/inflation_calculator.htm to adjust awards from the date of entry of the verdict or conclusion of the appeal. *Jennings*, 18 F.4th at 393 & n.7.

**B. Remittitur of the compensatory damages awards is unnecessary**.

The parties did not request that the jury specify the amount of damages for each category of compensatory damages it awarded. Defendants raised no objection to the verdict sheet and raise none in their motion papers.

Regarding damages relating to the malicious prosecution claim, defendants ignore all but the $12,000 damages Mr. Besedin owed to his criminal defense attorney, Lloyd Nadel, Esq. (Defs. Memo at 31-37; Tr. 212.) They ignore that Mr. Besedin spent approximately four days in pre-trial detention and the County Jail before he made bail. (Tr. 447; Brewington Dec. at ¶ 8 and Exh. 7). In *McDevitt v. County of Suffolk*, 16-cv-4164, 2024 U.S. Dist. LEXIS 53860 (E.D.N.Y. Mar. 26, 2024),[1] Judge Brown recognized that the filing of a baseless felony complaint caused the plaintiff

---

[1] Scott A. Korenbaum, Esq., represented Mr. McDevitt in connection with post-trial motion practice. Defendants incorrectly claim that Mr. McDevitt prevailed on his excessive force claim. Defs. Memo at

-34-

to spend an additional 18 hours in the Suffolk County Correctional. *Id.* at *11. Because of the absence of evidence relating to the damages the plaintiff experienced as a result of the prolonged detention, Judge Brown concluded that $2,000/hr. represented a reasonable sum for loss of liberty damages. *Id.* at *12-13 & n.9.

Here, too, the Court can consider loss of liberty damages. The Court instructed the jury regarding loss of liberty damages in connection with plaintiff's false arrest claim. (Tr. 956.) It did not instruct the jury that it could not consider loss of liberty damages for any of Mr. Besedin's other claims, and, as *McDevitt* demonstrates, there is no reason to preclude them in connection with a malicious prosecution claim that leads to an extended and unlawful period of confinement.

Mr. Besedin spent no fewer than 72 hours in custody following his arrest. He was arrested on February 7, 2017, at approximately 7:20 p.m. Brewington Dec. at Exh. 3 (Plaintiff's Exh. 13-B). Bail was posted on February 10, 2017.[2] In *Gardner v. Federated Dep't Stores, Inc.*, 907 F.2d 1348, 1353 (2d Cir. 1990), the Second Circuit remitted to $50,000 a jury award for loss of liberty damages for eight hours of unconstitutional confinement. Fifty thousand dollars translates to $121,000 in today's dollars. In light of the jury's finding that probable cause existed for Mr. Besedin's arrest, it is reasonable for the Court to attribute 72 hours to loss of liberty damages. At $2,000/hr., this totals $144,000. Utilizing *Gardner*'s numbers, this translates to more than $600,000.

The Court can and should attribute damages to the emotional distress Mr. Besedin experienced as a result of the baseless criminal prosecution. Defendants incorrectly assert there was

---

27. He did not. *McDevitt*, 2024 U.S. Dist. LEXIS 53860, at *3 & n.2.

[2] Defendants incorrectly assert that Mr. Besedin spent two days in custody. Defs. Memo at 36. Mr. Besedin was in custody from at least February 7-10th, and his bail was posted on the 10th, which did not mean he was released at once.

-35-

no evidence of emotional injuries relating to the criminal prosecution. Nadel testified that Mr. Besedin "was very upset. He was very despondent. He was very depressed at being the subject of these charge – as being subjected to these charges." (Tr. 211.) The jury heard similar testimony from Dr. Berrill, who described Mr. Besedin as angry about being arrested, and how "[b]ecause he was a veteran he couldn't imagine that someone would treat him this way, particularly someone in law enforcement, someone in government." (Tr. 618, 620.) Dr. Berrill also diagnosed Mr. Besedin with PTSD. Here, the jury could easily award well over $125,000 for emotional distress damages relating to the criminal prosecution. *See Emamian v. Rockefeller Univ.*, 2018 U.S. Dist. LEXIS 97674, at *44-45 (S.D.N.Y. June 8, 2018) (recognizing that "Garden variety" emotional distress claims generally merit $30,000.00 to $125,000.00 awards.) (quotations and citations omitted), *aff'd*, 823 Fed. Appx. 40 (2d Cir. 2020) (summary order).

Mr. Besedin in no way shape or form experienced garden variety emotional distress. As Dr. Berrill explained, his PTSD was causally related to the events of February 7th. (Tr. 625, 629-632 and 634.) "[E]gregious emotional distress claims generally involve either outrageous or shocking discriminatory conduct or a significant impact on the physical health of the plaintiff[,]" which can far exceed $200,000. *Ravina v. Columbia Univ.*, 16-CV-2137, 2019 U.S. Dist. LEXIS 56556, *38-39 (S.D.N.Y. March 31, 2019) (quotation omitted).

Regarding the jury's award of damages relating to excessive force, defendants again ignore substantial evidence of Mr. Besedin's decline. The jury obviously credited Mr. Besedin's evidence that he suffered a mild TBI as a result of Mantovani's hurling him from the porch onto the concrete pathway. Contrary to their claim, the jury heard from a number of witnesses about Mr. Besedin's deterioration. As Nadel testified, "with demeanor I observed he appeared to be deteriorating. The longer this case went, the more depressed he appeared, the more morose he

-36-

appeared, the more defeated he appeared. His dress was getting sloppier. His hair was getting more unkempt. He was more unshaven. And he just appeared to be deteriorating during the course of the 11-and-a-half months I had contact with him." Nadel also described how Mr. Besedin's ability to articulate deteriorated, and how "he appeared to get more irritated. He appeared to get more upset at the proceedings, more impatient, less happy. He, you know, didn't seem to be happy at all, actually." (Tr. 227-28.)

Meaningful testimony was also provided by Mr. Besedin's daughter, Laura, who described the changes she saw in her dad. As she shared with the jury, "I mean my dad was a mechanic, so he worked with his hands. He did manual labor, usually six days a week. He would get dirty, but he was, you know -- would maintain and care for himself, whether it be eating, cooking, bathing." But after February 7th, she described how "he really was not taking care of himself. He would go a long time without bathing. He was unable to, basically, get through his day from simple -- simple decisions that he had to make to even cooking and maintaining himself, to get through a regular day that he had been doing for so long." (Tr. 228.) And as detailed above, Dr. Berrill attributed the decline in Mr. Besedin's well-being to Mantovani's actions. He also diagnosed Mr. Besedin as suffering from PTSD, which defendants do not challenge and of which they make no mention.

In *Alla v. Verkay*, 979 F. Supp. 2d 349 (E.D.N.Y. 2013), defendant Verkay punched the plaintiff in the side of the head one time. As a result, the plaintiff sustained a mild TBI and emotional harm. *Id.* at 365. Judge Block easily upheld an award of non-economic damages in the amount of $250,000, which translates to $338,000 in today's dollars. In *Kennedy v City of New York*, 2019 NYLJ LEXIS 4530 (Sup. Ct. N.Y. County Dec, 12, 2019), the trial court upheld an award of $300,000.00 for past pain and suffering over a period of five years where plaintiff sustained a mild traumatic brain injury, PTSD, as well as multiple bruises and burn marks on her

-37-

back after use of excessive force by a police officer, and $100,000 for future pain and suffering. Four hundred thousand dollars translates to $491,000 in today's dollars.

In sum, the jury's award of compensatory damages represented a careful review and consideration of the evidence. The Court should reject this aspect of the defendants' motion in its entirety.

## CONCLUSION

The defendants made unconscionable choices at every step of the way. Instead of letting Mr. Besedin be, Mantovani violently threw Mr. Besedin from his porch onto the concrete pathway. Instead of charging him with a violation, they falsified their accounts in an effort to convict him of crimes he did not commit. And when video surfaced that put the lie to their accounts, they continued to double down on their falsehoods. The jury saw through the lies, and its verdict reflects a careful assessment of the evidence. For these reasons, the defendants' motions should be denied in all respects.

Dated: New York, New York
        December 27, 2024            Respectfully submitted,

                                     LAW OFFICES OF FREDERICK K. BREWINGTON
                                     556 Peninsula Blvd.
                                     Hempstead, NY 11550
                                     (516) 489-6959

                                     SCOTT A. KORENBAUM, ESQ.
                                     14 Wall Street, Suite 1603
                                     New York, NY 10005
                                     (212) 587-0018

                                     Co-counsel for Plaintiffs
                                     By: _____ /s _____
                                            Scott A. Korenbaum

FREDERICK K. BREWINGTON, ESQ.,
SCOTT A. KORENBAUM, ESQ.,
        of Counsel

-38-